[Civ. No. 27868. Fourth Dist., Div. Two. Oct. 7, 1982.]

KSDO et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
MERVYN FEINSTEIN et al., Real Parties in Interest.

COUNSEL

Higgs, Fletcher & Mack, Dennis P. Hickman and Michael L. Ward for Petitioners.

No appearance for Respondent.

Herbert Hafif, Gary E. Cripe and Ai Woodward for Real Parties in Interest.

OPINION

**TROTTER, J.**—This case involves the scope of a newsperson's privilege not to disclose confidential sources or unpublished material. Petitioners, defendants below, seek a writ to prevent the trial court from enforcing a discovery order requiring defendants to disclose certain unpublished information.

FACTS

Real parties in interest, plaintiffs below, are members of the Riverside Police Department. They filed a complaint for libel and violation of civil rights, alleging the following:

That defendant Clark, the Riverside County Sheriff, initiated an investigation of the Riverside Police Department to prove the police department was engaging in illegal conduct; that Sheriff Clark had no knowledge or suspicion of any wrongdoing, but initiated the investigation in hopes of finding something, solely for the purpose of helping Clark maintain his position as sheriff; and that as a result of the investigation, the sheriff's department caused to be disseminated, broadcast, and published a report that the plaintiffs and other members of the Riverside Police Department were involved in drug trafficking between the United States and Mexico, including the use of official police cars for smuggling drugs across the border.

Defendant KSDO radio and Hal Brown, a news reporter for KSDO, broadcast the following report:

"KSDO News has learned that an investigation is being conducted into allegations of widespread corruption involving two Southern California law enforcement agencies, one in the San Diego area and an unidentified bail bondsman. According to a source close to the investigation the probe involves alleged corruption in the handling of a major heroin smuggling case by one or [more] members of the Drug Enforcement Administration based in National City and the alleged transportation of large amounts of heroin from Tijuana to Riverside by city police in official cars. The probe is said by sources to reach in the highest levels of the Riverside P.D."

The Riverside Press-Enterprise essentially repeated the KSDO broadcast:

"Radio station KSDO, quoting unidentified law enforcement officials, accused Riverside police officers of using city police cars [for] transporting heroin from Mexico.

"In his report, radio newsman Hal Brown charged that 'corruption reaches into [the] highes[t] level[s] of [the] Riverside Police Department.' " (Riverside Press-Enterprise, Apr. 24, 1980, morning edition.)

"The report also said the RPD was being investigated for helping the federal Drug Enforcement Administration cover up the alleged involvement of a Riverside bail bondsman in a Mexican drug smuggling ring." (Riverside Press-Enterprise, Apr. 24, 1980, evening edition.)

"[T]he broadcast, aired April 23, on all news radio station KSDO, quoted . . . unnamed law enforcement sources as saying Riverside police officers had used city police cars to transport heroin from Mexico thwarted an investigation into a bail bondsman's involvement in drug smuggling.'' (Riverside Press-Enterprise, May 20, 1980.)

During plaintiffs' deposition of defendant Brown, the KSDO reporter who investigated the story, Brown revealed the sources of his information which led to the news report and the broadcast on KSDO radio. Plaintiffs then brought a motion to produce documents seeking Brown's notes and memoranda of conversations between Brown and certain named persons.

Defendants Brown, KSDO and Gannett Co., Inc. opposed the motion on the ground that the notes and memoranda were privileged, based on Evidence Code section 1070, California Constitution, article I, section 2, and, parenthetically, the United States Constitution.

The trial court granted the motion, ordering defendants to produce Brown's notes and memoranda, holding that: (1) in other cases applying the shield law the newsperson was not a party, but had information relevant to a pending criminal case, whereas in the instant case the newsperson was a party to a libel action; (2) Evidence Code section 1070 and California Constitution article I, section 2 simply prohibit holding the newsperson in contempt but do not proscribe other sanctions; (3) by disclosing the sources of his information Brown waived whatever privilege he may have had in the notes; and, (4) plaintiffs would have no other way to get Brown's notes except from Brown or his employer, so that there was no alternate source for plaintiffs to get the information sought.

Defendants then brought a petition for a writ of mandate/prohibition to prevent enforcement of the discovery order.

DISCUSSION

I

*The California "Shield Law"*

The description "shield law" conjures up visions of broad protection and sweeping privilege. The California shield law, however, is unique in that it affords only limited protection. It does not create a privilege for newspeople, rather it provides an immunity from being adjudged in contempt. This rather basic distinction has been misstated and apparently

misunderstood by members of the news media and our courts as well. A brief review of the history of the California shield law seems appropriate. In 1935 the California Legislature passed the first shield law. (Stats. 1935, ch. 532, § 1, pp. 1608-1610.) Code of Civil Procedure section 1881, subdivision 6, provided that newspaper employees could not be adjudged in contempt for refusal to disclose sources to courts or legislative or administrative bodies. Subsequent amendments extended the immunity to employees of radio and television stations, press associations and wire services. (Stats. 1961, ch. 629, § 1, pp. 1797-1798.) Former Code of Civil Procedure section 1881 in addition to the immunity for newspersons also contained other sections that dealt with privileges against testifying (e.g., husband and wife, attorney and client, etc.). Therein the confusion began. In 1965 the Legislature transferred the privilege sections of the California Code of Civil Procedure to the Evidence Code and the former subdivision 6 of section 1881 of the Code of Civil Procedure became Evidence Code section 1070 but was separated from all of the other former provisions of Code of Civil Procedure section 1881 which contained true privileges. (Stats. 1965, ch. 299, § 2, pp. 1297, 1323-1335.) The California Law Revision Commission which was responsible for the initial drafting of the Evidence Code noted: "Despite the absence of reliable evidence in the form of legislative history or judicial interpretation, the effect of the statutory privilege in California appears to be a carte blanche grant of an absolute and unqualified privilege to newsmen to refuse to disclose the source of any information procured for and used in the protected news media." (Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. V, Privileges (Feb. 1964) 6 Cal. Law Revision Com. Rep. (1964) pp. 481, 484.) Despite the strong language of the commission and its intended grant of privilege, the Legislature clearly rejected the concept of privilege and appended a comment to section 1070 which states: "Section 1070 continues without change the provisions of subdivision 6 of Code of Civil Procedure Section 1881. [¶] It should be noted that Section 1070, like the existing law, provides an immunity from being adjudged in contempt; *it does not create a privilege.* Thus, the section will not prevent the use of other sanctions for refusal of a newsman to make discovery when he is a party to a civil proceeding." (Assembly Committee on Judiciary Comment to Evid. Code, § 1070, 29B West's Annot. Code (1966 ed.) p. 655; italics supplied.) Amendments to Evidence Code section 1070 in 1971,[1] 1972,[2] and 1974[3] extended the coverage of the section to newspersons who were no

---

[1]Statutes 1971, chapter 1717, section 1, page 3658.
[2]Statutes 1972, chapter 1431, section 1, page 3126.
[3]Statutes 1974, chapter 1456, section 2, page 3184.

longer employed, to a broader spectrum of judicial, legislative or administrative proceedings, and to magazine and other periodical reporters, and unpublished information, background notes, or radio or television "outtakes."

In its present form, Evidence Code section 1070 provides as follows: "(a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(b) Nor can a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(c) As used in this section, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

The next curious step in the evolution of the California shield law was the elevation of Evidence Code section 1070 to constitutional status by the adoption of Proposition 5 on the 1980 ballot amending article I, section 2 with virtually the exact language of Evidence Code section 1070. For those having viewed the shield law as one granting a privilege to newspersons, the elevation to the California Constitution of that privilege was to make it absolute and irrefutable. However, in reality California Constitution article I, section 2, provides no more of a

privilege than did section 1070 of the Evidence Code. The judicial history and case interpretation of the newsperson's privilege, as embodied in Evidence Code section 1070, are just as tortuous and confused as its legislative origins. In *Farr* v. *Superior Court* (1971) 22 Cal.App.3d 60 [99 Cal.Rptr. 342], the court correctly recognized the limited breadth and protection of the section while finding it not applicable for other reasons.

''Section 1070 read strictly does not include petitioner within the scope of its *immunity*. At the time of the hearing at which he refused to answer questions he was not a person described in the section. Petitioner argues that section 1070 must be construed broadly to include within its *immunity* a person who occupied a described status at the time he acquired the information whose source is sought although he no longer occupies the status when disclosure is required. He contends that otherwise the underlying purpose of the statute, the encouragement of free flow of information to the public, will be impaired by the reluctance of persons to communicate with reporters because of the possibility of the revelation of their identity if the reporter's status changes. Respondent counters with the argument that Evidence Code section 1070 is considerably less than an all embracing effort to aid the flow of information by protecting sources. Thus, respondent notes that the section, while *immunizing* persons connected with newspapers, radio, and television from contempt for failure to reveal a source does not protect persons connected with magazines, free lance authors, lecturers, or pamphleteers. (*Application of Cepeda,* 233 F.Supp. 465, 473; cf. Comment, 6 Harv.Civ. Rights-Civ.Lib. L.Rev. 119, 130.)

''*On the narrow facts of the case at bench we do not reach the issue of construction of Evidence Code section 1070 as protecting former members of the newspaper, radio, and television profession[s] from liability to the sanction of contempt.* To construe the statute as granting immunity to petitioner Farr, in the face of the facts here present would be to countenance an unconstitutional interference by the legislative branch with an inherent and vital power of the court to control its own proceedings and officers.'' (*Farr* v. *Superior Court, supra,* 22 Cal.App.3d 60, 69; italics supplied.)

However, in *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190 [124 Cal.Rptr. 427], the court, in interpreting the protection afforded by Evidence Code section 1070, chose to rely upon the Law Revision Commission comment, *supra,* and not the Assembly Committee on Judiciary Comment to Evidence Code section 1070, *supra,* and stated at pages 217-218: ''Having in mind this rule as it relates to the unqualified

language used in Evidence Code section 1070, together with the observations of the California Law Revision Commission, we believe the Legislature in enacting Evidence Code section 1070 recognized the importance of maintaining a free flow of information and intended that the statute be given a broad rather than a narrow construction. *Accordingly, absent any constitutional or other limitation on the exercise of the privilege (see discussion, post), we believe it extends not only to the identity of the source but to the disclosure of any information,* in whatever form, which may tend to reveal the source of the information, and, as in the case of the privilege against self-incrimination, the burden is upon the person claiming the privilege to show that the testimony may tend to lead to that source.'' (Italics supplied.)

It should be noted, however, that both cases dealt with a contempt citation which was the intended area of concern of Evidence Code section 1070. Similarly In *Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388 [153 Cal.Rptr. 608], the petitioner had been cited for contempt and had been committed to the county jail for failing to turn over certain unpublished information. The court therein does talk in terms of privilege but appears to be using the term to describe petitioner's claim of immunity from being adjudged in contempt for failing to comply with the lower court's order.

Thus, the issue was joined, does Evidence Code section 1070 (and now Cal. Const., art. I, § 2) provide a sweeping privilege against disclosure or merely an immunity from contempt for refusal to disclose?

Petitioner herein cites the above cases and others as authority for a privilege existing in his favor and preventing compliance with the trial court's discovery order. He is mistaken but understandably so. ■ We find that section 1070 of the Evidence Code and California Constitution, article 1, section 2, confer no greater protection than their clear language provides: That a newsperson ''. . . shall not be adjudged in contempt . . . for refusing to disclose. . . .'' It is an immunity from contempt, not a privilege against disclosure. A discussion of the effects of the constitutionalization of that immunity is not necessary to resolution of the case before us. Petitioner's reference to cases from other jurisdictions is also misplaced. Those cases are premised on statutes which actually do provide a newsperson's privilege.[4] ''Thus, although a judge cannot find

---

[4]Petitioner cites, among others, *Maressa* v. *New Jersey Monthly* (1982) 89 N.J. 176 [445 A.2d 376]. However, at pages 381-382, the court sets forth the statute in question and states as follows: ''The Legislature revised the privilege to read:

''Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing

a reporter in contempt for concealing sources he may strike whatever defenses the reporter might have offered in a libel action or even award a plaintiff a default judgment. The reporter cannot look to Section 1070 to bail him out of this trouble. All the statute grants is immunity from contempt. It is not a privilege such as is provided in the other 13 states with newsmen statutes." (Comment, *Newsmen's Immunity Needs a Shot in the Arm* (1970) 11 Santa Clara Law. 56, 68, fns. omitted.) Thus petitioner's argument that the California shield law prohibits a discovery order requiring disclosure of defendant Brown's notes is without merit. In fact, the California shield law does not apply since petitioner has not been threatened with or cited for contempt. We therefore look to other sources to determine the appropriateness of such an order.

## II

### The First Amendment

■ While Evidence Code section 1070 does not grant a privilege to petitioner, he is not without protection that finds its genesis in the First Amendment of the federal Constitution. The generally accepted argument is that unless there is a constitutionally protected right to gather news, including the use of confidential sources, the free flow of information to the public (which is the underlying reason for the guarantee of a free press) would be inhibited. However, even that privilege is not absolute. Justice Powell in his concurring opinion in the case of *Branzburg v. Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646] referred to a balancing between the freedom of the press and a newsman's obligation in that case to testify.

The asserted claim of privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. Balancing of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional

---

or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated *has a privilege to refuse to disclose,* in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere. [Italics supplied.]

"a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and

"b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated. . . .

"These amendments left no doubt that the Legislature intended to provide comprehensive protection for all aspects of news gathering and dissemination."

ways of adjudicating such questions. (*Branzburg* v. *Hayes, supra,* 408 U.S. 655, 710 [33 L.Ed.2d 626, 656].) In *State* v. *St. Peter* (1974) 132 Vt. 266 [315 A.2d 254], the Supreme Court of Vermont stated: "[T]he language and attitude of the *Branzburg* majority [do] not indicate an entire absence of concern for the newsgathering function so relevant to the full exercise of the First Amendment. The opinion confines itself to grand jury proceedings and trials. It declines to pass upon appearance of newsmen before other bodies or agencies. Even more noteworthy, the concurring opinion of Mr. Justice Powell suggests that the First Amendment supports enough of a privilege in newsgatherers to require a balancing between the ingredients of freedom of the press and the obligation of citizens, when called upon, to give relevant testimony related to criminal conduct." (*Id.,* 315 A.2d at p. 255.) Thus, after careful examination, *Branzburg* and other cases interpreting *Branzburg* stand for a qualified newspersons' privilege to safeguard confidential sources and materials where the privilege furthers the First Amendment interest of the free flow of information. However, some type of balancing must determine the application of the privilege in any particular situation. In facing the question of whether to compel disclosure of a newsperson's confidential source, we must make a factual analysis to determine (1) the nature of the proceeding, (2) the status of the newsperson as a party or nonparty, (3) alternative sources of the information, and (4) the relationship of the information to the heart of the claim.

■ In criminal cases, it appears clear that public interest in law enforcement creates a substantial public need for disclosure. However, in civil cases, where the public interest in requiring disclosure is less compelling, stronger First Amendment protection would apply. This reasoning, however, seems valid only when the newsperson is not a party to the suit. Then, only if there is probable cause to believe relevant or material evidence is in the newsperson's possession and if there are no alternative sources for getting the information and further there is a compelling need that would otherwise allow a miscarriage of justice to result, may the nonparty newsperson be compelled to testify. (*Baker* v. *F & F Investment* (2d Cir. 1972) 470 F.2d 778, 783-784, cert. den. (1973) 411 U.S. 966 [36 L.Ed.2d 686, 93 S.Ct. 2147], applying the tests derived from *Application of Caldwell* (N.D.Cal. 1970) 311 F.Supp. 358, affd. *sub nom. Caldwell* v. *United States* (9th Cir. 1970) 434 F.2d 1081, revd. *sub nom. Branzburg* v. *Hayes, supra,* 408 U.S. 665.)

■ In libel suits such as the one before us in which a newsperson is a party and may have vital information directly related to the plaintiff's

claim, the courts have applied the "heart of the claim" test in determining whether a newsperson must reveal confidential sources. This test was first enunciated in *Garland* v. *Torre* (2d Cir. 1958) 259 F.2d 545. It is a pre-*Branzburg* case which was left intact by the United States Supreme Court's decision in *Branzburg*. (See *Branzburg, supra,* 408 U.S. at p. 686 [33 L.Ed.2d at pp. 642-643].) The truth or falsity of the material published is the essential issue in a libel case and therefore production of the reporter's notes for identification of his source can be essential to the plaintiff's successful prosecution. The reliability of the source or the accuracy of the notes is clearly called into focus. Where the plaintiff is a public figure, the need is especially great for the plaintiff there has to prove actual malice. In attempting to balance the competing interests in the case before us, we note that petitioner is a party newsperson to a civil libel case. This would generally tip the scales in favor of disclosure of the material in question. However, plaintiffs have failed to show that the information they seek from petitioner is unavailable from any other source or that the materials desired actually go to the heart of the claim.

Brown, at his deposition, revealed his sources to the plaintiffs. Thus, this case is taken out of the ambit of *Garland* v. *Torre, supra,* 259 F.2d 545, in which the reporter had attempted to protect the identity of his sources who gave him information. Rather, here, the sources have been revealed so that plaintiffs are free to test the reliability of those sources and there is no showing that it is necessary to have Brown's notes to do so. Basically, plaintiffs are now able to get the information they seek from sources other than Brown's notes.

We hold therefore that the qualified privilege under the First Amendment as above stated protects Brown and KSDO from having to reveal Brown's notes. The order compelling discovery of the notes is improper. A writ of mandate shall issue directing the trial court to annul its order requiring defendants to produce Brown's notes.

Morris, P. J., and McDaniel, J., concurred.