[S.F. No. 24685. Nov. 19, 1984.]

DAVID MITCHELL et al., Petitioners, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
SYNANON CHURCH et al., Real Parties in Interest.

COUNSEL

Paul Alexander, Robert E. Borton, Pamela A. Mull, Andrea G. Asaro, Regina A. Stagg and Heller, Ehrman, White & McAuliffe for Petitioners.

No appearance for Respondent.

Bourdette, Benjamin & Weill, Philip C. Bourdette and David R. Benjamin for Real Parties in Interest.

OPINION

**BROUSSARD, Acting C. J.**—Petitioners David and Cathy Mitchell seek a writ of prohibition to prevent the Marin County Superior Court from enforcing a discovery order requiring petitioners to produce documents revealing confidential sources of information. Their petition brings before this court for the first time the question whether in a civil action a newsperson has a privilege to refuse to reveal confidential sources or information obtained from those sources.

This petition stems from a libel action by The Synanon Church (Synanon) and Charles Dederich against the Reader's Digest, the Mitchells, David MacDonald, and Richard Ofshe. A petition for writ of mandate to review the trial court's denial of a motion for summary judgment by MacDonald and the Reader's Digest is also before this court. (*Reader's Digest Assn.* v. *Superior Court* (1984) *ante,* p. 244 [208 Cal.Rptr. 137, 690 P.2d 610].) The opinion in that case sets out the background of the underlying lawsuit, describes the Reader's Digest article which led to that suit, and analyzes the alleged defamatory statements in that article.

In brief summary, the Reader's Digest article, by staff writer David MacDonald, describes how the Mitchells won the Pulitzer Prize for a series of reports and editorials critical of Synanon which appeared in their weekly newspaper, the Point Reyes Light. The article contains the following statements: "Synanon was founded in 1958 by Charles Dederich, a reformed alcoholic, to rehabilitate drug addicts. Though his spectacular claims of success were never proved, Dederich and Synanon attracted publicity and enough cash donations to start a string of addiction centers. . . . Since 1968, minimal drug rehabilitation work had been attempted; funds, however, were still solicited on that basis." Plaintiffs charge that such language implies that plaintiffs were not successful at drug rehabilitation and that their claims of success were fraudulently made to enrich themselves.

Although Synanon and its members have filed other lawsuits against the Mitchells, charging defamation in the Point Reyes Light and in the Mitchells' later book, The Light on Synanon, the present case concerns only the Reader's Digest account. Synanon claims that the Mitchells, Professor Richard Ofshe, David MacDonald, and the Reader's Digest "conspired and acted in concert with each other to write, edit and publish to and among each other and to the readers of the article the false, malicious and defamatory words and language contained therein."

The Reader's Digest revealed the sources for its article: the Mitchell's newspaper accounts, The Light on Synanon, Professor Ofshe's research papers, conversations with Ofshe and the Mitchells, and a few other, less significant, sources. Plaintiffs, however, want to discover the sources' sources. They sent the Mitchells 2 requests to produce documents, the first listing 27 broad categories of documents and the second specifying over 10 different documents. We do not set out the requests in full, as many are overlapping or duplicative. The breadth of the discovery sought is indicated by request number 8 from the first set of requests, which asks for "Each and every document, other than as described [and requested] above, referring to or relating to Synanon and/or Charles E. Dederich in the possession, custody or control of defendants prior to the publication of the Reader's Digest Article." Synanon's counsel made it clear that they were not limiting their request to documents shown to MacDonald or the Reader's Digest; they wanted to review all documents available to the Mitchells in order to prove that the Mitchells selectively relied on some documentary evidence and ignored other evidence more favorable to Synanon.

The Mitchells objected to request number 8 and many other requests on the ground "that it is vague and ambiguous and, to the extent it is intelligible, is overbroad, unduly burdensome, and calls for information protected from disclosure by, inter alia, The First Amendment to the Constitution of the United States, The First Amendment to the Constitution of the State of California and the common law."[1] The superior court, however, ordered the Mitchells to identify every document responsive to the first and second requests, and to produce all documents described under specific items, including request number 8, of the first request to produce.

The Mitchells, uncertain whether the court had ruled on their claim of privilege, withheld documents tending to reveal confidential sources and asked the court to clarify its order. Ruling from the bench in response to

---

[1]By "The First Amendment to the California Constitution" the Mitchells presumably mean article I, section 2, which embodies the California constitutional protection of freedom of the press. This article was part of the original California Constitution of 1849, where it was article I, section 9, and was not an amendment.

the motion to clarify, the judge stated that he was ruling that the asserted privilege does "not exist in California." The Mitchells now seek a writ of prohibition to bar enforcement of the court's order requiring them to produce the withheld documents.

 California by statute (Evid. Code, § 1070) and by constitutional amendment (art. I, § 2, subd. (b)) provides that "[a] publisher, editor, reporter, or other person connected with or employed upon a newspaper . . . shall not ["cannot" in Evid. Code] be adjudged in contempt . . . for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper . . . or for refusing to disclose any unpublished information."[2] Since contempt is generally the only effective remedy against a nonparty witness, the California enactments grant such witnesses virtually absolute protection against compelled disclosure. A party to civil litigation who disobeys an order to disclose evidence, however, may be subject to a variety of other sanctions, including the entry of judgment against him. (See Code Civ. Proc., § 2034.) Neither Evidence Code section 1070 nor article I, section 2, subdivision (b), protects a party against such sanctions. (See *Playboy Enterprises, Inc.* v. *Superior Court* (1984) 154 Cal.App.3d 14, 26 [201 Cal.Rptr. 207].) The Mitchells, as defendants in Synanon's libel suit, therefore seek to assert a nonstatutory privilege based on the broad protections for freedom of the press enshrined in the United States Constitution and the correlative provision (art. I, § 2, subd. (a)) of the California Constitution.[3]

In *Zerilli* v. *Smith* (D.C.Cir. 1981) 656 F.2d 705, Judge J. Skelly Wright explained the importance of a reporter's privilege to the fundamental values protected by the First Amendment. "The First Amendment," he said, "guarantees a free press primarily because of the important role it can play as 'a vital source of public information.' [Citing *Grosjean* v. *American Press Co.* (1936) 297 U.S. 233, 250 (80 L.Ed. 660, 668, 56 S.Ct. 444).] . . . Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists

---

[2]Approximately half of the states have enacted newsmen's shield laws more or less similar to the California law. (For a listing as of 1980, see Comment, *The Newsman's Qualified Privilege: An Analytical Approach* (1980) 16 Cal. Western L.Rev. 331, 368, fn. 284.)

[3]Two courts have recognized a common law reporter's privilege without relying on constitutional provisions. (*Riley* v. *City of Chester* (3d Cir. 1979) 612 F.2d 708, 715; *Senear* v. *Daily Journal-American, etc.* (1982) 97 Wn.2d 148 [641 P.2d 1180, 1182].) Evidence Code section 911, however, precludes the creation of a common law privilege in California. According to section 911, "[e]xcept as otherwise provided by statute . . . [n]o person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing." Section 911 obviously cannot bar privileges based on constitutional provisions, but does prevent judicial creation of new common law privileges.

to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." (Pp. 710-711, fns. omitted.)

In similar language Judge Irving Kaufman in *Baker* v. *F. & F. Investment* (2d Cir. 1972) 470 F.2d 778, certiorari denied, 411 U.S. 966 [36 L.Ed.2d 686, 93 S.Ct. 2147], declared that: "Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis. . . . The deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting, the dividends of which are revealed in articles such as [this] threatens freedom of the press and the public's need to be informed." (P. 782.)[4]

Judicial decisions, however, recognize that other significant values favor disclosure. *Herbert* v. *Lando* (1979) 441 U.S. 153 [60 L.Ed.2d 115, 99 S.Ct. 1635], reminds us "that the individual's interest in his reputation is also a basic concern" (p. 169 [60 L.Ed.2d at p. 129]), and that the assertion of an evidentiary privilege would impede his ability to prove actual malice (p. 170 [60 L.Ed.2d at p. 130]). Justice Stewart in *Garland* v. *Torre* (2d Cir. 1958) 259 F.2d 545, certiorari denied, 358 U.S. 910 [3 L.Ed.2d 231, 79 S.Ct. 237], acknowledged the argument for privilege based on the First Amendment, but added that "[b]asic too are courts of justice, armed with the power to discover the truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press." (P. 548.) The Iowa Supreme Court in *Winegard* v. *Oxberger* (1977) 258 N.W.2d 847, 850, referred to "the longstanding principle that the public has a right to every person's evidence."[5]

---

[4]Two other cases present dramatic illustrations of the value of the reporter's privilege. *Democratic National Committee* v. *McCord* (D.D.C. 1973) 356 F.Supp. 1394, involved an attempt to compel reporters to reveal the identity of sources who supplied information concerning the Watergate burglary, information which eventually led to the resignation of President Nixon. In denying disclosure, the court stated that it "cannot blind itself to the possible 'chilling effect' the enforcement of these broad subpoenas would have on the flow of information to the press, and so to the public." (P. 1397.) In *Gilbert* v. *Allied Chemical Corp.* (E.D.Va. 1976) 411 F.Supp. 505, the court held that a radio station could refuse to disclose sources who told it of the medical hazards at a chemical manufacturing plant; the court noted that "[I]f a news station or newspaper is forced to reveal the confidences of their reporters, the sources so disclosed, other confidential sources of other reporters, and potential confidential sources will be significantly deterred from furnishing further information to the press." (P. 508.)

[5]*Apicella* v. *McNeil Laboratories, Inc.* (E.D.N.Y. 1975) 66 F.R.D. 78 was a product liability suit in which both plaintiffs and defendants wanted to depose the editor of a medical newsletter who claimed to have knowledge, based on secret sources, of dangerous properties of a drug. The court noted that in such cases there is a public interest in full disclosure so that other physicians and patients can evaluate the risks of the drug. (See *id.,* at p. 82.)

We cannot ignore or subordinate the First Amendment values furthered by the protection of confidential sources and information; at the same time, we must recognize the parallel importance of the policy favoring full disclosure of relevant evidence. When called upon to weigh the fundamental values arguing both for and against compelled disclosure, the overwhelming majority of courts have concluded that the question of a reporter's privilege in civil cases must be decided on a case-by-case basis, with the trial court examining and balancing the asserted interests in light of the facts of the case before it. Thus, the courts conclude, there is neither an absolute duty to disclose nor an absolute privilege to withhold, but instead a qualified privilege against compelled disclosure which depends on the facts of each particular case. (See *Zerilli* v. *Smith, supra,* 656 F.2d 705, 712; *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.* (1st Cir. 1980) 633 F.2d 583, 595-596; *Miller* v. *Transamerican Press, Inc.* (5th Cir. 1980) 621 F.2d 721, 725, cert. den., 450 U.S. 1041 [68 L.Ed.2d 238 101 S.Ct. 1759]; *Riley* v. *City of Chester, supra,* 612 F.2d 708, 715; *Silkwood* v. *Kerr-McGee Corp.* (10th Cir. 1977) 563 F.2d 433, 438; *Carey* v. *Hume* (D.C. Cir. 1972) 492 F.2d 631, 636, cert. den., 417 U.S. 938 [41 L.Ed.2d 661, 94 S.Ct. 2654]; *Baker* v. *F & F Investment, supra,* 470 F.2d 778, 784; *DeRoburt* v. *Gannett Co., Inc.* (D. Hawaii 1981) 507 F.Supp. 880, 884; *Loadholtz* v. *Fields* (M.D.Fla. 1975) 389 F.Supp. 1299, 1301; *Democratic National Committee* v. *McCord, supra,* 356 F.Supp. 1394, 1397-1398; *Apicella* v. *McNeil Laboratories, Inc., supra,* 66 F.R.D. 78, 82; *Gadsden County Times, Inc.* v. *Horne* (Fla.App. 1983) 426 So.2d 1234, 1241; *Winegard* v. *Oxberger, supra,* 258 N.W.2d 847, 850; *Senear* v. *Daily Journal-American, etc., supra,* 641 P.2d 1180, 1183.)[6]

The only California case to address this question also concluded that a claim of privilege must be judged by balancing the asserted interests on a case-by-case basis. (*KSDO* v. *Superior Court* (1982) 136 Cal.App.3d 375, 384-385 [186 Cal.Rptr. 211].)

In arguing against a qualified reporter's privilege, Synanon relies on two United States Supreme Court decisions, *Branzburg* v. *Hayes* (1972) 408

---

[6]A few courts have rejected even a qualified privilege. The Idaho Supreme Court so held in *Caldero* v. *Tribune Pub. Co.* (1977) 98 Idaho 288 [562 P.2d 791], certiorari denied, 434 U.S. 930 [54 L.Ed.2d 291, 98 S.Ct. 418], but later said that it would not require disclosure when the confidential sources supplied only leads and not relevant evidence. (*Sierra Life Ins.* v. *Magic Valley Newspapers* (1980) 101 Idaho 795 [623 P.2d 103, 109].) The Massachusetts Supreme Judicial Court held that there was no privilege, qualified or absolute. (*Dow Jones & Company, Inc.* v. *Superior Court* (1973) 364 Mass. 317 [303 N.E.2d 847, 849].) In a later case, however, it indicated its willingness to reconsider discovery guidelines in cases involving confidential sources. (*Matter of Roche* (1980) 381 Mass. 624 [411 N.E.2d 466, 476].) *Adams* v. *Associated Press* (S.D.Tex. 1969) 46 F.R.D. 439, 441, held that there was no reporter's privilege under Texas law.

U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646] and *Herbert* v. *Lando, supra,* 441 U.S. 153. Neither involved the assertion of a reporter's privilege in a civil case and, as we shall explain, nothing in the reasoning of those cases precludes recognition of a qualified privilege.

*Branzburg* raised the question whether newspersons could be required to testify before a grand jury investigating crimes. The majority opinion, by Justice White, acknowledged that news gathering falls within First Amendment protection, but said that the public interest in law enforcement and in ensuring effective grand jury proceedings outweighed the burden on news gathering said to result from requiring reporters to respond to grand jury subpoenas.

Justice Powell, the fifth member of the *Branzburg* majority, wrote a concurring opinion. In it, he observed that "The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." (P. 709 [33 L.Ed.2d p. 656].) Justice Powell then went on to state that if a newsman claimed a privilege to withhold information, "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." (P. 710 [33 L.Ed.2d p. 656].)

Reasoning that Justice Powell's position represents the "minimum common denominator" (*Gilbert* v. *Allied Chemical Corp., supra,* 411 F.Supp. 505, 510) of the *Branzburg* majority, subsequent cases have concluded that it does not preclude the use of a balancing test to evaluate the claim of privilege in civil cases. (See *Zerilli* v. *Smith, supra,* 656 F.2d 705, 711; *Bruno & Stillman, Inc.* v. *Globe Newspaper Co., supra,* 633 F.2d 583, 594; *Loadholtz* v. *Fields, supra,* 389 F.Supp. 1299, 1301.) The leading case, *Baker* v. *F & F Investment, supra,* 470 F.2d 778, observed that "Manifestly, the Court's concern with the integrity of the grand jury as an investigating arm of the criminal justice system distinguishes *Branzburg* from the case presently before us. If, as Mr. Justice Powell noted in that case, instances will arise in which First Amendment values outweigh the duty of a journalist to testify even in the context of a criminal investigation, surely in civil cases, courts must recognize that the public interest in a non-disclosure of journalists' confidential news sources will often be weightier than the private interest in compelled disclosure." (Pp. 784-785.)

In *Herbert* v. *Lando, supra,* 441 U.S. 153, plaintiff, a reputed military hero, sued Lando, the producer and editor of a television program, and

author of a subsequent article. Plaintiff deposed Lando and asked numerous questions relating to how Lando decided what to include, and what not to include, in the program and article. Lando refused to answer on the ground that the First Amendment prohibited inquiry into the state of mind of those who edit, produce, or publish and into the editorial process.

The majority opinion, again by Justice White, rejected this claim of privilege. In effect, the majority reasoned that the *New York Times* test, which requires proof of actual malice to recover for defamation against a public figure (see *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412]) properly balanced the interest of the press and the interest of litigants seeking discovery, and that imposing an additional editorial privilege would upset that balance and make it virtually impossible for a plaintiff to assemble proof to comply with that test. (See 441 U.S. at p. 170 [60 L.Ed.2d at p. 130].) Once again Justice Powell wrote a separate concurring opinion, primarily to emphasize "the additional point that, in supervising discovery in a libel suit by a public figure, a district court has a duty to consider First Amendment interests as well as the private interests of the plaintiff." (P. 178 [60 L.Ed.2d at p. 135].)

*Herbert* involved an editorial privilege, not a reporter's privilege. Lower courts quickly noted that distinction. The Fifth Circuit, in *Miller* v. *Transamerican Press, Inc., supra,* 621 F.2d 721, said that "The policies supporting a First Amendment privilege would appear to be stronger . . . where a defamation plaintiff seeks to compel disclosure of the name of a confidential informant . . . than they were in either *Branzburg* or *Herbert.* In *Herbert,* the Supreme Court reasoned that requiring disclosure of journalists' thought processes would have no chilling effect on the editorial process; the only effect would be to deter recklessness. However, forced disclosure of journalists' sources might deter informants from giving their stories to newsmen. . . . [A] defamed plaintiff might relish an opportunity to retaliate against the informant." (P. 725; accord, *Gadsden County Times, Inc.* v. *Horne, supra,* 426 So.2d 1234, 1240, fn. 7.) In *Greenleigh Associates, Inc.* v. *The New York Post Corporation* (1980) 79 App.Div.2d 588 [434 N.Y.S.2d 388], the court applied this distinction and upheld discovery of the newspaper's editorial process, but not of its confidential sources.

We agree with those courts which have distinguished *Branzburg* and *Herbert* from the issue of discovery of sources in civil litigation. In criminal proceedings, both the interest of the state in law enforcement, recognized as a compelling interest in *Branzburg* (see 408 U.S. 665, 700 [33 L.Ed.2d 626, 650]), and the interest of the defendant in discovering exonerating evidence outweigh any interest asserted in ordinary civil litigation. Discovery

of the editorial process, permitted by *Herbert,* does not pose the same threat of inhibiting investigative reporting as would the disclosure of confidential sources. As the *Herbert* court itself observed, a conscientious editor is unlikely to be deterred from publishing by the fear that his identity and editorial process were subject to discovery. (See 441 U.S. 153, 173-174 [60 L.Ed.2d 115, 131-132].) A confidential source, on the other hand, might well be deterred by the threat that his identity and information might be made public.

■ Synanon finally argues that the power of the superior court to issue discovery protective orders to protect against "annoyance, embarrassment, or oppression" (Code Civ. Proc., § 2019) is a sufficient safeguard against the abuse of discovery, and makes recognition of a qualified reporter's privilege unnecessary. But discovery which seeks disclosure of confidential sources, and information supplied by such sources, is not ordinary discovery. Judicial concern is not limited to cases of harassment, embarrassment, or abusive tactics; even a limited, narrowly drawn request may impinge upon First Amendment considerations. When a reporter's privilege has been defined by the courts, the limitations on that privilege described, and the relevant considerations set out, Code of Civil Procedure section 2019 provides the statutory basis for the issuance of protective orders safeguarding against harassment. The broad language of that section, however, cannot substitute for judicial explication of the basic privilege.

■ We conclude that in a civil action a reporter, editor, or publisher has a qualified privilege to withhold disclosure of the identity of confidential sources and of unpublished information supplied by such sources. The scope of that privilege in each particular case will depend upon the consideration and weighing of a number of interrelated factors.

First, the scope of the privilege depends on the nature of the litigation and whether the reporter is a party. In general, disclosure is appropriate in civil cases, especially when the reporter is a party to the litigation. (In California, where a shield law prevents the use of contempt to enforce disclosure orders (see p. 274, *ante*), compelling disclosure from a nonparty reporter may be impractical even in a case in which other considerations argue in favor of disclosure.) *Zerilli* v. *Smith, supra,* 656 F.2d 705, explained that "[w]hen the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure. . . . [T]his will be particularly true in libel cases involving public officials or public figures. . . . Plaintiffs in those cases must prove both that the allegedly defamatory publication was false, and that it was made with 'actual malice.' Proof of actual malice will frequently depend on knowing the identity of the newspaper's

informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story. Protecting the identity of the source would effectively prevent recovery in many *Times*-type libel cases. . . . We take care to point out, however, that disclosure should by no means be automatic in libel cases. Where other relevant factors suggest disclosure is inappropriate, the privilege should prevail." (P. 714, fn. omitted.)[7] Thus the present case, a libel suit in which discovery is sought from a party defendant,[8] is of the type suitable for requiring disclosure, depending upon the balancing of other relevant considerations.

 A second consideration is the relevance of the information sought to plaintiff's cause of action. (See *Miller* v. *Transamerican Press, Inc., supra,* 621 F.2d 721, 726; *Bruno & Stillman, Inc.* v. *Globe Newspaper Co., supra,* 633 F.2d 583, 597.) The majority view, which we adopt, is that mere relevance is insufficient to compel discovery; disclosure should be denied unless the information goes "to the heart of the plaintiff's claim." (*Garland* v. *Torre* (2d Cir. 1958) 259 F.2d 545, cert. den., 358 U.S. 910 [3 L.Ed.2d 231, 79 S.Ct. 237]; accord, *Zerilli* v. *Smith, supra,* 656 F.2d 705, 713; *Silkwood* v. *Kerr-McGee Corp., supra,* 563 F.2d 433, 438; *Carey* v. *Hume, supra,* 492 F.2d 631, 636; *Baker* v. *F & F Investment, supra,* 470 F.2d 778, 784; *KSDO* v. *Superior Court, supra,* 136 Cal.App.3d 375, 385-386; cf. *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 859 [143 Cal.Rptr. 695, 574 P.2d 766].)

The parties before us dispute whether the disclosure plaintiffs seek goes to the "heart" of their suit against the Mitchells or is only peripheral to that matter. The dispute centers on the question of the liability of a reporter who furnishes defamatory material to the publisher, but does not control the content of the ultimate publication. Plaintiffs contend that through disclosure they will learn "[t]he extent to which the petitioners [Mitchells] were told, and then ignored, facts contrary to their defamations" and "[t]he extent to which petitioners sought only to find derogatory information. . . ." They suggest the possibility that they will discover that the Mitchells had no sources, or at least no reliable sources. The Mitchells, on the other hand, urge that we adopt the view advanced by the Court of Appeal that as sources the Mitchells would be liable only if they conspired with the Reader's Digest to publish maliciously false statements about plaintiffs or exercised some form of control over the content of the article. Proof of conspiracy or con-

---

[7]Other cases distinguishing between discovery against a party and a nonparty reporter include *Silkwood* v. *Kerr-McGee Corp., supra,* 563 F.2d 433, 438; and *KSDO* v. *Superior Court, supra,* 136 Cal.App.3d 375, 385-386.

[8]We do not decide the question whether the reporter's privilege may be asserted by a party plaintiff.

trol, they maintain, not the identity of their sources, lies at the heart of this lawsuit.[9]

We do not agree with the restrictions on the responsibility of a reporter proposed by the Court of Appeal. ■ In our opinion, if a source acting with actual malice furnishes defamatory material to a publisher with the expectation that the material (either verbatim or in substance) will be published, the source should be liable for the publication. As the United States Supreme Court said in 1899, if a publisher was furnished "with information of a libelous character . . . for the purpose and with the intention of having the same published . . . we think that the defendant might be held liable for such publication on the ground that it was published by his aid and procurement. . . ." (*Washington Gas Light Company* v. *Lansden* (1899) 172 U.S. 534, 549-550 [43 L.Ed. 543, 550, 19 S.Ct. 296].) More recently, the court in *Campo* v. *Paar* (1963) 18 App.Div.2d 364 [239 N.Y.S.2d 494, 498], held that "Anyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damages caused by the publication."

The law relating to the liability of an original defamer for republication offers relevant guidelines. According to the Restatement Second of Torts (1977) section 576, the original defamer is liable if either "the repetition was authorized or intended by the original defamer" (subd. (b)) or "the repetition was reasonably to be expected" (subd. (c)). California decisions follow the restatement rule. (See *Di Giorgio Corp.* v. *Valley Labor Citizen* (1968) 260 Cal.App.2d 268, 273 [67 Cal.Rptr. 82]; *Curley* v. *Vick* (1963) 211 Cal.App.2d 670, 673 [27 Cal.Rptr. 501].) In *McKinney* v. *County of Santa Clara* (1980) 110 Cal.App.3d 787 [168 Cal.Rptr. 89], the court, holding a defendant liable for a foreseeable republication by the plaintiff himself, explained that "[t]he rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." (P. 797.)

The present suit does not precisely allege a republication. Plaintiffs are suing for the defamation in the Reader's Digest, not (in this suit) for statements appearing in the Point Reyes Light or The Light on Synanon, and do not allege that the Reader's Digest repeated the exact words of the Mitchells. The rule imposing liability for republication, however, turns on fore-

---

[9]The Court of Appeal observed that under the language of plaintiffs' complaint the Mitchells could be liable for defaming plaintiffs in the Mitchells' communications with the Reader's Digest. The complaint does not identify the substance of any communication by Mitchells to the Reader's Digest, but could conceivably be amended after discovery to allege such communications.

seeability, not exact reproduction. If plaintiffs can show a sufficient causal link between the Mitchells and the Reader's Digest article, they can come within the rationale of the republication rule. The Mitchells would then be responsible for language in the article based on information furnished by them to the Reader's Digest.

The liability of the Mitchells, however, would depend upon proof that they acted with actual malice in the original publication of the defamatory matter. (Cf. *Montandon v. Triangle Publications* (1975) 45 Cal.App.3d 932 [120 Cal.Rptr. 196].) ■ Discovery of the Mitchells' sources, and information derived from such sources, may be essential to proving actual malice, and thus goes to "the heart" of plaintiffs' claim against these defendants. The discovery sought by plaintiffs, however, is quite broad, and is not limited to sources whose information relates to the alleged libelous statements. The Reader's Digest article contains many other statements critical of Dederich and the Synanon operation. Knowledge of the source of such statements, while arguably relevant to the suit, is not sufficiently essential to justify overriding the reporter's privilege.

■ Third, virtually all cases agree that discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information. (See, e.g., *Baker v. F & F Investment, supra,* 470 F.2d 778, 784; *Gilbert v. Allied Chemical Corp., supra,* 411 F.Supp. 505, 510; *KSDO v. Superior Court, supra,* 136 Cal.App.3d 375, 384-386.) ■ Compulsory disclosure of sources is the "last resort" (*Senear v. Daily Journal-American, etc., supra,* 641 P.2d 1180, 1184), permissible only when the party seeking disclosure has no other practical means of obtaining the information. (See *Zerilli v. Smith, supra,* 656 F.2d 705, 714-715.)

■ In the present case plaintiffs made no showing that they have exhausted alternative sources of information. Many of the Mitchells' sources are known—Professor Ofshe and other persons mentioned in the Reader's Digest article or the Mitchells' own publications. Such persons can be deposed to discover what information they furnished the Mitchells. Moreover, to the extent plaintiffs seek to prove that the Mitchells deliberately ignored information furnished them favorable to Synanon, it is likely that the sources of the information would readily come forward and cooperate with plaintiffs. There may well be an irreducible core of information which cannot be discovered except through the Mitchells, but plaintiffs have not yet reduced their discovery to that core.

■ Fourth, the court should consider the importance of protecting confidentiality in the case at hand. (See *Bruno & Stillman, Inc. v. Globe Newspaper Co., supra,* 633 F.2d 583, 597; *Democratic National Committee v.*

*McCord, supra,* 356 F.Supp. 1394, 1397; *Senear* v. *Daily Journal-American, etc., supra,* 641 P.2d 1180, 1184.) ■ The investigation and revelation of hidden criminal or unethical conduct is one of the most important roles of the press in a free society—a role that may depend upon the ability of the press and the courts to protect sources who may justifiably fear exposure and possible retaliation. Thus when the information relates to matters of great public importance, and when the risk of harm to the source is a substantial one, the court may refuse to require disclosure even though the plaintiff has no other way of obtaining essential information.

■ Finally, the court may require the plaintiff to make a prima facie showing that the alleged defamatory statements are false before requiring disclosure.[10] ■ "The falsity of the . . . charges . . . should be drawn into question and established as a jury issue before discovery is compelled" (*Bruno & Stillman, Inc.* v. *Globe Newspaper Co., supra,* 633 F.2d 583, 597), because "to routinely grant motions seeking compulsory disclosure . . . without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles [of *New York Times* and similar cases]" (*Cervantes* v. *Time, Inc.* (8th Cir. 1972) 464 F.2d 986, 993).

This requirement is closely related to the previous one. There is a great public interest in the truthful revelation of wrongdoing, and in protecting the "whistleblower" from retaliation; there is very little public interest in protecting the source of false accusations of wrongdoing. A showing of falsity is not a prerequisite to discovery, but it may be essential to tip the balance in favor of discovery.

■ The Reader's Digest article, and especially the earlier writings by the Mitchells, clearly relate to matters of public importance; they allege serious wrongdoing by a powerful private organization, and complicity by public officials. Defendants have hinted that sources might be subject to retaliation but have offered no proof on the point. Plaintiffs, on the other hand, have not attempted a prima facie showing of the falsity of the defamatory statements.

In conclusion, the superior court in this case ordered extensive disclosure of sources and information on the ground that there was no reporter's privilege in California. We have concluded that the basis for this ruling was

---

[10]Justice Brennan, dissenting in *Herbert* v. *Lando, supra,* 441 U.S. 153, 197 [60 L.Ed.2d 115, 147], proposed to require a plaintiff to make a prima facie showing in order to overcome a claim of editorial privilege. The majority rejected that proposal. (441 U.S. at p. 174, fn. 23 [60 L.Ed.2d at p. 133].) We do not construe that rejection, in the context of a claimed privilege for the editorial process of the publisher, as barring a court from requiring a prima facie showing in evaluating a claimed reporter's privilege.

erroneous; that the California courts should recognize a qualified reporter's privilege, depending upon a balancing of the relevant considerations in each case. In the present case, the generality of plaintiffs' requests, the absence of a showing that alternative sources had been exhausted, and the absence of a prima facie showing of falsity strike the balance against discovery of the scope envisioned in the ruling below.

Let a peremptory writ of prohibition issue, restraining the superior court from enforcing its discovery order of November 16, 1982, insofar as such order requires petitioners to produce documents which reveal confidential sources or information furnished by such sources.[11]

Mosk, J., Kaus, J., Reynoso, J., Grodin, J., Lucas, J., and Rouse, J.,* concurred.

---

[11]This decision is without prejudice to the right of real parties in interest to file a new motion to compel production of documents which reveal confidential sources or information furnished by such sources, based upon a showing sufficient to overcome the qualified privilege described in this opinion.

*Assigned by the Acting Chairperson of the Judicial Council.