[No. S006709. Sept. 27, 1990.]

NEW YORK TIMES COMPANY, Petitoner, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY,
Respondent;
JEROME SORTOMME et al., Real Parties in Interest.

454

**COUNSEL**

Price, Postel & Parma, Gary R. Ricks, Judith A. Brown, C. Michael Cooney, Peter M. Tiersma and Kenneth A. Richieri for Petitioner.

No appearance for Respondent.

Coffield, Ungaretti, Harris & Slavin, Joseph A. Cari, Michael T. Trucco, Peter J. Wifler and Harold E. Kahn as Amici Curiae on behalf of Respondent.

Herzfeld & Rubin, Richard L. Ackerman, Michael A. Zuk, Roy D. Goldstein and Seymour W. Croft for Real Parties in Interest.

Wilbur F. Littlefield, Public Defender (Los Angeles), Laurence M. Sarnoff and Albert J. Menaster, Deputy Public Defenders, as Amici Curiae on behalf of Real Parties in Interest.

**OPINION**

**EAGLESON, J.**—We are asked to decide in this case whether the California newspersons' shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) provides a newspaper publisher with immunity from contempt for its refusal to comply with a civil subpoena for unpublished photographs of an automobile accident on a public highway. The threshold question is whether the term "unpublished information" in the shield law includes

information not obtained by a newsperson in confidence.[1] When we granted review in this case, the Courts of Appeal were in sharp conflict on the question. We recently resolved that conflict in *Delaney v. Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934] (hereafter *Delaney*), a criminal prosecution in which we unanimously held the shield law's protection is not contingent on a showing that a newsperson's unpublished information was obtained in confidence.

There remains in this case the question of whether the shield law's protection can be overcome in a *civil* action by a litigant's showing of need for the newsperson's unpublished information. The shield law on its face provides an absolute immunity. In *Delaney, supra,* 50 Cal.3d 785, we held that, in a *criminal* proceeding, our state's shield law may nevertheless be overcome by the defendant's showing that nondisclosure would deprive him of his federal constitutional right to a fair trial. There is no similar right in this personal injury action sufficient to overcome the shield law.

This case also raises the procedural issue of whether a newsperson can seek extraordinary writ relief from an adverse trial court ruling under the shield law before a judgment of contempt is entered. As we will explain, the shield law by its own terms provides only an immunity from contempt, not a privilege. Thus, a newsperson's petition for extraordinary relief is premature until a judgment of contempt is entered.

The third issue is whether the shield law allows a trial court to impose sanctions other than contempt, including monetary sanctions under Code of Civil Procedure section 1992. We conclude they are allowed because the unambiguous language of the shield law precludes only the sanction of contempt.

## FACTS

Jerome Sortomme and Joyce Sortomme, while traveling in a Volkswagen van, were involved in an automobile accident with another vehicle on a public highway in Santa Barbara County. A news photographer for the Santa Barbara News-Press (the News-Press), acting within the scope of his employment, took several photographs of the accident scene.[2] The News-Press does not contend its photographer promised anyone involved in the accident that the photographs would be kept in confidence. Two were published in the newspaper; the remainder were not published.

---

[1] We use the term "newsperson" for convenience to refer to all the categories of persons identified in the shield law. (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.)

[2] The News-Press is owned by petitioner the New York Times Company.

The Sortommes filed a product liability action against real party in interest Volkswagen of America, Inc. (Volkswagen), seeking recovery for personal injuries, including the loss of one of Jerome's legs. The Sortommes also filed an action against the State of California, alleging negligent highway design.

Volkswagen served the News-Press with a subpoena for production of "all photographs, negatives, notes, [and] letters" in the possession of the News-Press that related to the accident. The trial court quashed the subpoena but ordered the News-Press to compare its unpublished accident photographs with 15 photographs that had been taken by the California Highway Patrol (CHP) to determine if the News-Press photographs contained any pertinent information not revealed by the CHP photographs. The News-Press did so and informed Volkswagen that the unpublished photographs did contain pertinent information, some of which was not in the CHP photographs. The News-Press concluded, however, that its photographs were of "very little . . . additional value" beyond the CHP photographs and refused to provide copies to Volkswagen.

Volkswagen moved to compel production of the photographs. The News-Press opposed the motion, arguing that, because it is not a party to the action, its unpublished photographs are absolutely privileged under California's shield law. (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.) The trial court concluded the News-Press held only a qualified privilege under the shield law and, in an attempt to weigh the interests of all affected parties, ordered the News-Press to produce its photographs for an in camera inspection so that the court could determine whether the claim of privilege was outweighed by Volkswagen's right to discover relevant information[3]

The News-Press petitioned the Court of Appeal for an extraordinary writ and stay of the trial court's order. The Court of Appeal issued a writ of mandate directing the trial court to set aside its memorandum of decision ordering an in camera inspection and to enter a new order denying Volkswagen's motion to compel. The Court of Appeal held the shield law provides "absolute protection to nonparty journalists in civil litigation from being compelled to disclose unpublished information."

---

[3] The trial court found the News-Press's photographs "go to the heart of the plaintiff's claim" and that, although there are alternate sources of information (including the CHP photographs), the "photographs are needed by the plaintiff." Because the photographs were not taken in confidence, the court also found that "there is not an overriding importance in protecting the confidentiality of the information at hand."

DISCUSSION

A. *The News-Press's petition to the Court of Appeal was premature.*

Before turning to the substantive issue of whether Volkswagen is entitled to the unpublished photographs, we must first resolve a procedural matter. ■ The question is whether a newsperson can seek extraordinary writ relief from an adverse trial court ruling under the shield law *before* the newsperson is adjudged in contempt. In this case, the trial court ordered the News-Press to produce its unpublished photographs for in camera inspection. On the court-ordered date for the inspection, the News-Press sought relief from the trial court's order. In practical effect, the News-Press's petition to the Court of Appeal was an attempt to avoid the possibility of being adjudged in contempt by the trial court. The petition was premature.

Article I, section 2, subdivision (b) of the California Constitution states that newspersons *"shall not be adjudged in contempt . . .* for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public."[4] (Italics added.) The provision's statutory counterpart, Evidence Code section 1070, contains a virtually identical provision. In *Delaney, supra,* 50 Cal.3d 785, we reviewed this unambiguous language and the equally clear legislative history of the shield law and concluded that " . . . the shield law provides only an immunity from contempt, not a privilege." (*Id.,* at p. 797, fn. 6.) We also disapproved all prior decisions to the contrary. (*Ibid.*)

---

[4] For convenience and brevity we refer in the remainder of this opinion to the constitutional provision as article I, section 2(b). It states in its entirety: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

Because the shield law provides only an immunity *from contempt*, there is nothing from which to seek relief until a newsperson has been adjudged in contempt.

The effect of the immunity-privilege distinction was correctly explained in *KSDO* v. *Superior Court* (1982) 136 Cal.App.3d 375 [186 Cal.Rptr. 211] (hereafter *KSDO*), in which a radio station and its reporter, defendants in a libel action, sought a writ to prevent the trial court from enforcing an order requiring them to disclose unpublished information. The Court of Appeal explained, "The California shield law . . . is unique in that it affords only limited protection. It does not create a privilege for newspeople, rather it provides an immunity from being adjudged in contempt. This rather basic distinction has been misstated and apparently misunderstood by members of the news media and our courts as well." (*Id.*, at pp. 379-380.) The *KSDO* court held the shield law did not apply because the defendants had not been threatened with or cited for contempt. As we noted in *Delaney, supra*, 50 Cal.3d 785, 797, footnote 6, we agree with the *KSDO* court, and we reiterate that the shield law provides only an immunity from contempt, not a privilege. Allowing relief before a judgment of contempt would violate the unambiguous language of the shield law.[5]

Precontempt relief would also have undesirable practical effects. Such relief would deprive trial courts of the opportunity to decide in the first instance whether the shield law applies to the facts of a case. As we explained in *Delaney, supra*, 50 Cal.3d 785, a newsperson claiming the shield law's protection must establish that he meets all the law's requirements. (*Id.*, at pp. 805, fn. 17, & 806, fn. 20.) Premature writ petitions would frustrate, and perhaps preclude, this determination. The reviewing courts, in turn, would be hampered. The role of a reviewing court is " 'merely to ascertain whether there was sufficient evidence before the trial court' " to support a contempt adjudication. (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248], quoting *In re Ciraolo* (1969) 70 Cal.2d 389, 394 [74 Cal.Rptr. 865, 450 P.2d 241].) Premature interference in trial court proceedings would deprive reviewing courts of adequate factual records for making this determination. Premature relief

---

[5]The observation by the court in *KSDO, supra*, 136 Cal.App.3d 375, 379-380, that the California shield law is atypical, appears to be correct. The language of other states' shield laws generally either states a privilege or protects against disclosure without any reference as to the types of sanctions prohibited. The clear implication is that all sanctions are prohibited. (See, e.g., Ala. Code § 12-21-142; Alaska Stat. § 09.25.150; Ind. Code § 34-3-5-1; Md. Ann. Code art. 35, § 2; Nev. Rev. Stat. Ann. § 49.275; N.J. Stat. Ann. § 2A:84A-21; N.D. Cent. Code § 31-01-06.2; Ohio Rev. Code Ann. § 2739.04; Tenn. Code Ann. § 24-1-208.) These other statutes demonstrate that our Legislature or voters could have worded California's shield law more broadly if they had intended to provide more than an immunity from contempt.

would also allow newspersons to avoid the responsibility of choosing between disclosing information or being held in contempt. A newsperson would have no incentive to make that choice until after a decision by a reviewing court. The result would be an increased burden on reviewing courts.

We hold that a newsperson's petition for extraordinary relief is premature until a judgment of contempt has been entered.[6] To conclude otherwise would be inconsistent with our decision in *Delaney, supra*, 50 Cal.3d 785, that the shield law is unambiguous and means what it says. The Court of Appeal in this case erred by granting relief before the newsperson was held in contempt.[7]

Although the unambiguous language and explicit legislative history of the shield law and sound judicial policy mandate our conclusion that a judgment of contempt is a prerequisite for writ relief, we are not unmindful of the need to avoid unnecessary confinement of a newsperson who is seeking the protection of a specific constitutional guaranty under article I, section 2(b). To avoid confinement under a judgment of contempt that may subsequently be set aside, a trial court should stay its judgment of contempt to allow the contemner newsperson sufficient time in which to seek writ relief if the trial court believes there is any colorable argument the newsperson can make against the contempt adjudication. If the trial court nevertheless declines to issue a stay, a reviewing court should do so pending its decision whether to issue an extraordinary writ.[8]

Although the Court of Appeal's issuance of mandate in this case was premature, we nevertheless proceed to the merits of the dispute without

---

[6] We disapprove of the contrary holding in *CBS, Inc.* v. *Superior Court* (1978) 85 Cal.App.3d 241, 247 [149 Cal.Rptr. 421].

[7] Because the shield law provides only an immunity from contempt rather than a privilege, this case is unlike those in which writ relief was granted to review a trial court order compelling the disclosure of *privileged* information. (See, e.g., *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309].)

[8] Justice Mosk's concurring and dissenting opinion states that precontempt writ relief should be allowed when a reporter asserts a qualified privilege under the First Amendment to the United States Constitution rather than an immunity under this state's shield law. Perhaps so, but the reason is that a newsperson's protection under the First Amendment is characterized as a privilege. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274-279 [208 Cal.Rptr. 152, 690 P.2d 625] (hereafter *Mitchell*).) In the present case, the newsperson relies on the shield law, which by its terms provides only an immunity from contempt, not a privilege. Moreover, no First Amendment issue is before us. Because we hold the information in this case is absolutely protected under the shield law (*post*, at pp. 461-462), the News-Press has obtained all the relief it seeks. We therefore need not and do not decide whether unpublished information *not* obtained in confidence is subject to a qualified privilege under the First Amendment. Discussion of that issue would be mere dictum. The dissent's raising of the issue *is* premature.

suggesting any exception to the rule that a judgment of contempt is a prerequisite for writ relief. Volkswagen, the party seeking discovery, does not object to the prematurity of the News-Press's petition for appellate relief. More important, we simultaneously granted review in this case and in *Delaney, supra,* 50 Cal.3d 785, to decide important issues as to the scope and operation of the shield law. Under these circumstances, no purpose would be served by remanding the case to the trial court merely for the purpose of entering a contempt judgment.

B. *The shield law provides an absolute rather than a qualified immunity.*

■ The primary issue addressed by the parties in this court is whether the shield law applies to unpublished information that was not obtained by a newsperson in confidence. We recently answered that question in *Delaney, supra,* 50 Cal.3d 785, in which we unanimously held the shield law's protection is *not* contingent on a showing that a newsperson's unpublished information was obtained in confidence. *(Id.,* at p. 805.) In light of *Delaney,* the unpublished photographs at issue in this case are clearly within the scope of the shield law. There remains, however, the question of whether they are nevertheless discoverable, that is, whether the shield law immunity is qualified rather than absolute.

In *Mitchell, supra,* 37 Cal.3d 268, we explained that "Since contempt is generally the only effective remedy against a nonparty witness, the California enactments [article I, section 2(b) and Evidence Code section 1070] grant such witnesses *virtually absolute protection* against compelled disclosure." *(Id.,* at p. 274, italics added.)[9] We implicitly reached the same conclusion in *Delaney, supra,* 50 Cal.3d 785, in which we held that a criminal defendant's federal constitutional right to a fair trial may in some cases overcome a claim of immunity under the state shield law. *(Id.,* at p. 805.) If the shield law itself provided for a balancing approach, i.e., a qualified immunity, there would have been no need for us to turn to the federal Constitution. We remain of the same view. We find nothing in the shield law's language or history to suggest the immunity from contempt is qualified such that it can be overcome by a showing of need for unpublished information within the scope of the shield law.[10]

[9] The reference in *Mitchell, supra,* 37 Cal.3d 268, 274, to "virtually" absolute protection did not mean the shield law itself provides for a balancing of competing interests. The reference was in the context of the court's discussion of the difference between parties and nonparties in regard to the sanctions that can be imposed for failure to comply with a discovery order.

[10] By contrast, some states' shield laws specifically provide for a balancing approach. (Alaska Stat. § 09.25.220; Ill. Rev. Stat. ch. 110, par. 8-907; La. Rev. Stat. Ann. § 45:1459; Md. Cts. & Jud. Proc. Code Ann. § 9-112; Minn. Stat. § 595.023; N.D. Cent. Code § 31-01-06.2; Tenn. Code Ann. § 24-1-208.)

This is a typical personal injury action for damages, in which a party seeks discovery of photographs taken by a nonparty newsperson in a public place. *On the facts of this case*, we are not aware of any federal or state constitutional right of Volkswagen (the party seeking discovery) sufficient to overcome the News-Press's claim of immunity under the state shield law. Volkswagen admits it knows of no authority that would support such a constitutional right but asks us to create one in this case for the first time. The facts of this case do not support such a drastic innovation. This case is unlike *Delaney, supra*, 50 Cal.3d 785, in which there was a need to balance a newsperson's interest against a criminal defendant's well established federal constitutional right to a fair trial.[11]

C. *The shield law does not preclude statutory sanctions other than contempt.*

■ Volkswagen contends that, even if the shield law applies to the News-Press's unpublished photographs, the newspaper is subject to sanctions other than contempt. Volkswagen relies on Code of Civil Procedure section 1992, which states, "A witness disobeying a subpoena also forfeits to the party aggrieved the sum of five hundred dollars ($500), and all damages which he may sustain by the failure of the witness to attend, which forfeiture and damages may be recovered in a civil action." The question is whether the shield law precludes monetary sanctions under Code of Civil Procedure section 1992.[12]

The answer follows from our holding that the shield law provides only an immunity from contempt, not a privilege. (*Ante*, at pp. 458-459; *Delaney, supra*, 50 Cal.3d 785, 797, fn. 6.) The *practical* effect of the distinction between an immunity and a privilege depends on whether the newsperson relying on the shield law is a party to the action in which discovery is sought. As we explained in *Mitchell, supra*, 37 Cal.3d 268, "A party to civil litigation who disobeys an order to disclose evidence . . . may be subject to a variety of other sanctions [besides contempt], including the entry of judgment against him . . . . Neither Evidence Code section 1070 nor article I, section 2, subdivision (b) protects a party against such sanctions." (*Id.*, at p. 274.) Our observation made clear that the shield law provides only an immunity from contempt. A privilege would prohibit all sanctions, not just

---

[11] We do not foreclose the possibility that in a future case a civil litigant seeking discovery from a nonparty newsperson might have either a state or federal constitutional right that would have to be weighed against a claim of immunity under the shield law. A trial court in such a case, however, should carefully consider whether the asserted constitutional right is sufficiently clear and important to overcome a newsperson's claim of immunity, which is grounded in a specific constitutional provision—article I, section 2(b).

[12] All section references in the remainder of this opinion are to the Code of Civil Procedure unless otherwise stated.

contempt, but we explained that other sanctions are available when the newsperson is a party to the action in which he is resisting discovery.

The court in *Mitchell, supra*, 37 Cal.3d 268, did not squarely address the slightly different question, now before us, of whether a *nonparty* newsperson can also be subject to sanctions other than contempt. (The newspersons in *Mitchell* were parties, and the scope of sanctions as to nonparties would have rendered any discussion of that issue dictum.) The linchpin of our reasoning, however, was that the shield law provides only an immunity *from contempt*. It necessarily follows from that conclusion that other sanctions, including those under section 1992, are not precluded. Our statement that " . . . contempt is generally the only *effective* remedy against a nonparty witness . . ." was merely an observation that other sanctions are ineffective, not a conclusion that they are impermissible. (37 Cal.3d at p. 274, italics added.)

The News-Press contends that, as a policy matter, the immunity should extend to all sanctions because, otherwise, the policy of protecting unpublished information would be subverted. This argument is unpersuasive. What the shield law *should* do is beyond our authority. (*Delaney, supra*, 50 Cal.3d at pp. 804-805.) The unambiguous language of the law refers only to an immunity from contempt.[13] Section 1992 was enacted in 1872, long before the shield law came into existence. We must presume the Legislature was well aware of section 1992 when it first enacted the shield law. To construe the shield law as restricting the operation of section 1992 would be tantamount to finding a repeal of the latter by implication. There is no indication the Legislature intended that result. " '[A]ll presumptions are against a repeal by implication.' " (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419 [261 Cal.Rptr. 384, 777 P.2d 157], quoting *Flores* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 171, 176 [113 Cal.Rptr. 217, 520 P.2d 1033].) If the Legislature wishes to preclude sanctions other than contempt, it can act accordingly. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 740 [257 Cal.Rptr. 708, 771 P.2d 406] [deferring to the Legislature to broaden the scope of a statute].) A judicially created immunity from all sanctions would blur the distinction between a privilege and an immunity, a distinction expressly declared by the Legislature (Evid. Code, § 1070) and adopted by the voters (art. I, § 2(b)). (*Ante*, at pp. 458-459.)

---

[13] The News-Press is inconsistent in arguing that the shield law should be construed literally with regard to its definition of "unpublished information" (i.e., to include nonconfidential information as to public events), while at the same time arguing that the law should *not* be construed literally with regard to the types of sanctions it prohibits. The News-Press cannot have it both ways. Either the shield law means what it says, or it does not. We adopt the former view.

Moreover, the News-Press's objection to section 1992 is largely academic. As we noted in *Mitchell, supra,* 37 Cal.3d 268, 274, "contempt is generally the only effective remedy against a nonparty witness." The monetary sanctions under section 1992 are not effective as a practical matter. The maximum sanction is a $500 forfeiture plus actual damages, and the party aggrieved by the failure to make discovery can recover the sanctions only by bringing an independent civil action. It would likely be a rare case in which a civil litigant would impose on himself the additional burden of a separate suit to recover a mere $500. The simple economics of modern litigation essentially preclude such an action. It is also doubtful that a litigant could prove substantial damages as a result of a newsperson's refusal to provide discovery. (Perhaps that is why there are only four reported decisions under the statute in the 118 years since it was enacted.) In short, monetary sanctions under section 1992 are virtually ineffectual. This refutes the News-Press's argument that the operation of section 1992 would frustrate the purpose of the shield law.

We hold the shield law does not preclude an award of sanctions under section 1992. Volkswagen is therefore entitled to bring an independent civil action under section 1992 to recover the sanctions and damages allowed under that statute.

### DISPOSITION

The unpublished photographs sought by Volkswagen are subject to the shield law. Because the immunity from contempt in this case is absolute, there is no need for the trial court to conduct an in camera inspection of the photographs.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Kennard, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in parts B and C of the majority opinion: the reporter's constitutional immunity prevails over any asserted interest of civil litigants in compelling discovery, and the immunity does not apply to sanctions other than contempt. I dissent, however, from the majority's conclusion in part A that the reporter may not seek to adjudicate, by writ review, the applicability of the constitutional immunity before being held in contempt.[1]

---

[1] The majority recommend that the trial court stay its contempt order pending pursuit of the reporter's postcontempt writ petition, and that if the lower court does not do so the

Instead, I would hold that there is an exception to this generally sound rule when, as here, (1) threat of contempt is imminent; (2) there are strong policy interests in early adjudication—in this case, fulfilling the basic purpose of the shield immunity to free reporters from having to choose between surrendering protected sources or being held in contempt; and (3) all the issues necessary for an appellate court to adjudicate the writ petition have already been litigated in a lower court. I emphasize that such an exception does not call for a change in California's writ system; rather, the exception is tailored to suit the unique timing problems raised by a constitutional immunity from contempt.

I. *The Fact That the Shield Law Provides Immunity From Contempt Does Not Resolve the Prematurity Issue*

The majority take the position that the very fact the shield law provides immunity from contempt rather than a privilege disposes of the question of when the issue should be adjudicated: "Because the shield law provides only an immunity *from contempt*, there is nothing from which to seek relief until a newsperson has been adjudged in contempt." (Maj. opn., *ante*, p. 459, italics in original.)

This reasoning, however, takes a somewhat metaphysical view of the issue of prematurity of adjudication. The fact that the shield is an immunity from contempt rather than a privilege governs only the *kind* of relief that can be granted, not the *timing* of that relief. As will appear, the timing of the adjudication is instead dictated by various jurisprudential and policy concerns that are similar to those underlying the doctrine of ripeness in the federal jurisdictional context.

A. *The Beneficial Interest of the Petitioner*

A party seeking writ relief must have a "beneficial interest" in the outcome of the proceeding. (Code Civ. Proc., §§ 1086, 1103.) The question whether a petitioner has a beneficial interest in the proceeding generally

---

appellate court should. (Maj. opn., *ante*, p. 460.) These recommendations mitigate the consequences flowing from the majority's position, but make the position no less erroneous.

Moreover, the precontempt writ review I propose would go further in protecting the reporter's rights under the shield law. Early adjudication of immunity claims would lead to expedited clarification of the reporter's rights and liabilities in the given situation, and accordingly decrease the risk of exercising those rights. It would also assure more effectively than the majority's recommendations that the reporter will spend no time in jail for good faith exercise of his rights under the shield law, especially in close cases when the trial court may be disinclined to grant a stay and the appellate court's issuance of a stay is less than prompt. Finally, it would spare those who justly exercise their rights from bearing the onus of being held in contempt.

concerns the question of standing: i.e., whether the petitioner has incurred an injury capable of redress. The requirement of beneficial interest will be relaxed, or broadly interpreted, when the petition seeks to vindicate a strong public interest or to enforce public rights. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256] [welfare recipients have standing to challenge overly restrictive welfare regulations not directly imposed on them]; *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017] [citizens have standing to sue to compel environmental impact study of annexation of nearby land].)

The doctrine of ripeness is logically related to the concept of standing and therefore to the concept of beneficial interest. Standing, ripeness, and the related doctrine of mootness all enforce the principle that courts will intervene in disputes over government action only "at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." (*Poe* v. *Ullman* (1961) 367 U.S. 497, 504 [6 L.Ed.2d 989, 996, 81 S.Ct. 1752] (plur. opn. of Frankfurter, J.).) Although considerations of ripeness generally preclude the redress of legal injuries before they have occurred, exceptions to this rule have evolved. Our notion of what constitutes a beneficial interest necessary to obtain writ review should reflect this evolution of the ripeness doctrine.

B. *The Doctrine of Ripeness and Challenges to Statutes Prior to Criminal Prosecution*

A useful analogy to the present case is a challenge to a criminal statute prior to prosecution. Although traditional notions of ripeness generally prevent such a challenge, there are exceptions: "it is not necessary that [the accused] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters with the exercise of his constitutional rights." (*Steffel* v. *Thompson* (1974) 415 U.S. 452, 459 [39 L.Ed.2d 505, 514, 94 S.Ct. 1209].) "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" (*Babbitt* v. *Farm Workers* (1979) 442 U.S. 289, 298 [60 L.Ed.2d 895, 906, 99 S.Ct. 2301].)

In *Steffel* v. *Thompson, supra,* 415 U.S. 452, the petitioner, who had distributed handbills against the Vietnam war outside a shopping center, sought declaratory relief from prosecution under a Georgia criminal trespass statute. In determining that the petitioner's claim was ripe for adjudication, the Supreme Court stressed that the threat of prosecution was not

speculative but that the petitioner had been warned on two previous occasions to cease distribution of the handbills or face prosecution.

In *Babbitt* v. *Farm Workers, supra,* 442 U.S. 289, the court held that provisions of an Arizona statute regulating union elections and prohibiting various forms of union-run consumer publicity campaigns presented an actual controversy, ripe for adjudication, despite the fact that plaintiff United Farm Workers (UFW) had not yet invoked the election procedures or conducted a consumer publicity campaign in the state. The UFW claimed these provisions violated its First Amendment free speech and associational rights. The Supreme Court observed that the UFW had an extensive record of running union elections and consumer publicity campaigns in California, and had the manifest intention of doing the same in Arizona. The court concluded that the UFW's curtailment of its First Amendment activities to avoid criminal prosecution, and to avoid participation in unrepresentative elections, rendered its challenge to the statute adjudicable. (*Id.* at pp. 297-305 [60 L.Ed.2d at pp. 905-911].) The court also rejected the view that adjudication of the election provisions "be postponed until 'a better factual record might be available'" (*id.* at p. 300 [60 L.Ed.2d at p. 907]); it concluded that no further information was needed to determine "the threshold question whether the election procedures are subject to scrutiny under the First Amendment at all." (*Id.* at p. 301 [60 L.Ed.2d at p. 908].)

A three-pronged test emerges from these cases to determine when a statute can be challenged prior to prosecution: (1) an important constitutional right is at stake that would benefit from early adjudication; (2) a prosecution or other sanction is "certainly impending" (*Babbitt* v. *Farm Workers, supra,* 442 U.S. at p. 298 [60 L.Ed.2d at p. 906]); and (3) at the point at which the adjudication occurs, there is either a sufficient record of how the challenged law would apply to the plaintiff, or a colorable claim that the law is substantially overbroad and therefore invalid on its face.

## C. *Application to the Present Case*

The challenge by writ of an impending contempt order presents a close analogy to the challenge of a statute prior to prosecution. As will be demonstrated, precontempt adjudication and writ review of the reporter's immunity meet all three prongs of the early-adjudication test articulated above.

First, the vindication of an important state constitutional right is at stake here, and that right would clearly benefit from early adjudication. The basic purpose of the constitutional shield law is to prevent reporters from being held in contempt and going to jail for protecting unpublished information and confidential sources. (See Ballot Pamp., Proposed Amends. to Cal.

Const. with arguments to voters, Gen. Elec. (June 3, 1980), argument in favor of Prop. 5, p. 19.) Precontempt adjudication of these claims—preventing reporters who justly invoke the privilege from serving any jail time—accomplishes this protective purpose and encourages the more vigorous exercise of the reporter's right.

We have recognized the desirability of early adjudication and writ review when a court compels disclosure of information that would jeopardize a privileged relationship. (*Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309] [precontempt writ review permitted to protect psychotherapist-patient privilege from improper discovery].) As we there explained, to refuse precontempt review would confront the holder of the privilege with unacceptable alternatives: "The person seeking to exercise the privilege must either succumb to the court's order and disclose the privileged information, or subject himself to a charge of contempt for his refusal to obey the court's order pending appeal. The first of these alternatives is hardly an adequate remedy and could lead to disruption of a confidential relationship. The second is clearly inadequate as it would involve the possibility of a jail sentence and additional delay in the principal litigation during review of the contempt order." (*Ibid.*) From a policy standpoint, that reasoning applies equally well to the exercise of the reporter's constitutional immunity to protect sources and unpublished information.

Second, there is in this case an injury—being held in contempt—that is "certainly impending." Once a motion to compel production of the reporter's documents has been granted or the reporter's motion to quash a subpoena has been denied, the threat to the reporter of being held in contempt moves from a mere possibility to an imminent reality. As in the federal cases cited above, the party seeking relief is on an inevitable collision course with the authority empowered to impose legal sanctions—here, the trial judge.

As to the third prong of the test, the majority assert that "Premature interference in trial court proceedings would deprive reviewing courts of adequate factual records for making [a] determination [of the applicability of the shield law]." (Maj. opn., *ante*, p. 459.) The basis for this statement is unclear. In most cases, all the issues related to the applicability of the shield law are litigated during the hearing on the various motions—to compel production, to quash the subpoena, etc. Indeed, this is how the majority were able to determine that the shield law applied in the present case, in spite of the fact that no contempt order had been issued when writ review was sought. If for some reason the factual record is insufficient, an appellate court could deny the writ petition on that basis *in that particular case.* Were

we to adopt the rule of precontempt writ review in reporter's shield cases, it is a virtual certainty that the material issues would be thoroughly litigated at the motion stage.

## II. Policy Considerations

The majority advance two policy considerations to bolster their argument that precontempt writ relief is premature. One, the incompleteness of the factual record, has just been discussed. The second, already partially discussed, merits additional comment.

The majority assert that "Premature relief would also allow newspersons to avoid the responsibility of choosing between disclosing information and being held in contempt. A newsperson would have no incentive to make that choice until after a decision by a reviewing court. The result would be an increased burden on reviewing courts." (Maj. opn., *ante*, pp. 459-460.)

This is a perplexing rationale. As noted above, the main purpose of the shield law is to free reporters from having to choose between protecting their unpublished information or being held in contempt. It is curious to argue that compelling this same choice is now the virtue of denying writ relief. The only way in which the majority's rule could reduce the appellate court docket one iota is by making it more burdensome for reporters to raise shield law claims. Not only would such a decrease in workload be minuscule at best, but it would be accomplished at the expense of vitiating the very purpose of the shield law.

## III. Qualified First Amendment Privileges

Finally, a reporter's claim to protect unpublished information and confidential sources may be based both on the shield law and on a qualified First Amendment privilege. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 279 [208 Cal.Rptr. 152, 690 P.2d 625].) Thus, if the "privilege/immunity" distinction is held to be decisive in determining whether precontempt writ relief is granted, the reporter who seeks the protection of both the shield immunity and the First Amendment privilege will be able to seek precontempt writ relief on the privilege claim and, if that relief is denied, return with a postcontempt writ petition based on his constitutional immunity.

To avoid squandering judicial resources in needless bifurcation of writ proceedings, we should therefore permit precontempt writ review in determining the applicability of the reporter's shield provision.

## Conclusion

The fact that the reporter's shield provision of the California Constitution is in the form of an immunity from contempt rather than a privilege does not ipso facto determine at what time the applicability of the shield law should be adjudicated. The ripeness of the adjudication is instead governed by various policy and jurisprudential considerations; in my view these considerations dictate that we should permit writ review prior to a contempt proceeding, once it is clear that contempt is imminent. The reporter should not be required to await writ review until he has suffered the humiliation of being held in contempt by a judge and a bailiff has placed him in handcuffs and led him off to jail.