[No. G023316. Fourth Dist., Div. Three. Jan. 8, 1999.]

RANCHO PUBLICATIONS, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
DOWNEY COMMUNITY HOSPITAL FOUNDATION et al., Real Parties
in Interest.

## COUNSEL

Davis, Wright, Tremaine, Kelli L. Sager; Karen N. Frederiksen; Boutwell, Behrendt & Ennor, Boutwell, Ennor, Fay & Fabricant and Deborah Fabricant for Petitioner.

No appearance for Respondent.

Manatt, Phelps & Phillips, Leonard D. Venger, Donald R. Brown and Norman Y. Wong for Real Parties in Interest.

## OPINION

**CROSBY, Acting P. J.**—The right to speak anonymously draws its strength from two separate constitutional wellsprings: the First Amendment's freedom of speech and the right of privacy in article I, section 1 of the California

Constitution. The anonymous pamphleteer is one of the enduring images of the American revolutionary heritage.

Publius, Cato and Brutus find their modern-day counterparts in "Save Our Hospital," a group which paid to run numerous advertisements in a local newspaper criticizing a local community hospital. The hospital used a preexisting civil lawsuit to find out who authored them. The reason? It suspected the same people previously distributed other anonymous documents of an allegedly defamatory nature.

We draw upon a well-established body of California case law which allows nonparties to civil litigation (such as a newspaper) to assert the constitutionally protected rights of an author to remain unknown. Applying a balancing test, we issue a writ because the speculative relationship between this anonymous speech and *other* statements which are alleged to be defamatory does not justify judicially compelled disclosure by a third party. Anonymity, once lost, cannot be regained; and that intrusion cannot be justified in the context of the underlying lawsuit.

I

Petitioner publishes a weekly newspaper, the Eagle, in Downey. That city has been rocked by a bitter dispute regarding publicly owned Downey Community Hospital which, in a complex and controversial restructuring, became affiliated (through a for-profit holding entity) with a for-profit HMO (health maintenance organization) and a for-profit health insurance provider. Charges of self-dealing, backroom deals, bribery, sexual misconduct, incompetence and mismanagement abounded.

The hospital and various affiliated persons and entities (collectively the hospital) filed several defamation lawsuits. They alleged a local doctor, Vernon Waite, and an anonymous organization, Concerned Citizens of Downey, have engaged in a "vicious and concerted scheme to ruin [plaintiffs'] reputations by publishing false and malicious writings about them in the Downey community." The lawsuits named 1,000 Doe defendants. The hospital invested heavily in discovery to ascertain the identity of these Does.

During the pendency of the defamation lawsuits, the Eagle began to run a series of paid advertorials[1] from another group, Save Our Hospital. There were more than 20 advertorials, beginning in September 1996 and running

---

[1]An advertorial (a term in use for more than 40 years) is an advertisement in a print publication that is formatted in the same style as a news article or editorial and conveys similar-looking content. (See *Ortho Pharmaceutical Corp.* v. *Cosprophar, Inc.* (2d Cir. 1994)

for more than a year. Some of the advertorials were individually signed; others were not. Many asked questions such as, "Why would Management and most of the [hospital] governing Board refuse to [state] they will not personally profit from the sale of the hospital?" Another criticized the hospital for subpoenaing "concerned residents who committed the terrible offense of signing a petition (and haven't the foggiest idea as to the identity of the writers of the anonymous letters)." Another attacked the "witch hunt" of deposing residents "with questions regarding the anonymous letter writers, Concerned Citizens and [Save Our Hospital]."

The hospital responded with a subpoena against the Eagle. The subpoena attached copies of the advertorials and demanded production of all documents pertaining to "advertisements or notices paid for by [s]upporters of Save Our Hospital" and all documents reflecting communications "to or from a member, supporter or representative of Save Our Hospital."

The Eagle moved to quash the subpoena and for a protective order based on the qualified privilege arising from the California constitutional right to privacy (Cal. Const., art. I, § 1) and the "absolute immunity" in California's media shield law (Evid. Code, § 1070; Cal. Const., art. I, § 2, subd. (b)). The court denied the motion, stating "[t]here is a very broad discovery right," and "[w]hen you take out an ad in the newspaper, that takes an advocacy position . . . I don't know that you have a right of privacy." The court further held the shield law did not apply to the paid advertorials because "[t]he intent of this law was to protect the integrity of the news gathering process from the state." The court opined that any more expansive rights would have to be spelled out by a higher court, "so, I certainly invite you to take this over to the Fourth District and let those philosopher kings decide what the law is."

In March 1998, the Eagle was adjudicated in contempt, but the order was stayed. Because the court order directed production of allegedly private materials, there was no adequate remedy at law and we issued an alternative writ. (*Hinshaw, Winkler, Draa, Marsh & Still* v. *Superior Court* (1996) 51 Cal.App.4th 233, 237 [58 Cal.Rptr.2d 791].)

## II

While we ultimately grant the Eagle the relief it seeks, we decline to do so through California's media shield law because it does not necessarily extend to paid advertisements. ■ The shield law, first enacted by statute in

---

32 F.3d 690, 693.) Advertorials have been described as "Editorial Space for Sale." (*Seldon* v. *Shanken* (1988) 143 A.D.2d 3 [531 N.Y.S.2d 264, 266].) They are the newspaper equivalent of television's infomercials.

1935, was incorporated into the Constitution in 1980 when the voters approved Proposition 5. (See discussion in *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 794-796 [268 Cal.Rptr. 753, 789 P.2d 934].)[2] It is intended to promote the free flow of information to the public by prohibiting courts from holding the media in contempt for refusing to disclose unpublished news sources or information received from such sources. Its *"primary* purpose" is to safeguard the media's "future ability to gather news." (50 Cal.3d at p. 810, italics added.)

The shield law is both expansive and narrow. On its face it provides an *absolute* immunity against contempt which cannot be overcome even "by a showing of need for unpublished information." (*New York Times Co.* v. *Superior Court* (1990) 51 Cal.3d 453, 461 [273 Cal.Rptr. 98, 796 P.2d 811] [newspaper refused to comply with a civil subpoena by car manufacturer for unpublished accident photographs].) It covers all unpublished information, whether confidential or nonconfidential, and all sources for such information, whether published or unpublished. (*Delaney* v. *Superior Court*, *supra*, 50 Cal.3d at pp. 797-805.)

Yet the shield law is riddled with holes. Most significantly, it only provides an immunity against contempt, rather than a more expansive privilege against testifying, as exists in other states. (*In re Willon* (1996) 47 Cal.App.4th 1080, 1091 [55 Cal.Rptr.2d 245]; Alexander & Bush, *Shield Laws on Trial: State Court Interpretation of the Journalist's Statutory Privilege* (1997) 23 J. Legis. 215, 222-223.) News organizations still may be subject to other penalties, including monetary and issue-preclusion sanctions (where they are direct party litigants, such as in defamation lawsuits), and civil liability to the propounding party for " 'all damages which he may sustain.' " (*New York Times Co.* v. *Superior Court*, *supra*, 51 Cal.3d at p. 462, citing Code Civ. Proc. § 1992.) And it yields to other conflicting rights in

---

[2]California Constitution, article I, section 2, subdivision (b) provides: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public. [¶] . . . [¶] As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."
Evidence Code section 1070 is virtually identical.

appropriate circumstances, including the due process rights of criminal defendants. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at pp. 805-806.)[3]

■ The shield law extends to "any unpublished information obtained or prepared in gathering, receiving or processing of *information for communication to the public.* . . ." (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070, italics added.) The Supreme Court itself has stressed the significance of this threshold factor: "We emphasize . . . the importance of this requirement. . . . [T]he shield law provides no protection for information obtained by a journalist not directly engaged in 'gathering, receiving or processing' news." (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 798, fn. 8.) *Delaney* pointed out, for example, that off-duty reporters who witnessed a crime while going home from work could not claim the benefit of the shield law because they were not involved in newsgathering activities. (*Ibid.*)

The Eagle argues against using *Delaney*'s reference to "news" in this footnote as a judicial addition of a news requirement into the shield law. Instead, the Eagle urges the use of the term "any" in the shield law means "without limit and no matter what kind." (Citing *Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 798.) So construed, the Eagle would have the shield law cover *all* paid advertisements without qualification.

We refuse to construe the shield law in such an absurd way. (*Provigo Corp.* v. *Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 566-567 [28 Cal.Rptr.2d 638, 869 P.2d 1163] [" 'the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a [constitutional provision] comports with its purpose . . . and the letter will, if possible, be so read as to conform to the spirit' "].) In its single-minded emphasis on the meaning of "any," the Eagle has downplayed the shield law's equally important requirement that the unpublished information be prepared in the process of gathering "*information for communication to the public.* . . ." (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070, italics added.) At a minimum the phrase "information for communication to the

---

[3]Given all these exceptions and limitations, it remains subject to considerable dispute whether, as a practical matter, the shield law grants news organizations "virtually absolute protection against compelled disclosure," as the Supreme Court claimed several decades ago. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274 [208 Cal.Rptr. 152, 690 P.2d 625].) News organizations understandably may have a more jaundiced view when they discover the target painted on them larger than the shield they have been provided.

In one commentator's view, the shield law, as interpreted by the courts, is such a "crazy quilt of standards" as to make its application "increasingly unpredictable for California journalists. Only an omniscient reporter could know prospectively when he or she agrees to keep a secret whether, and in what kind of proceeding, he or she will be subpoenaed." (Comment, *Promises Not to Be Kept: The Illusory Newsgatherer's Privilege in California* (1991) 25 Loyola L.A. L.Rev. 155, 161.)

public" requires that the person or entity invoking the shield law be engaged in legitimate journalistic purposes, or have exercised judgmental discretion in such activities. (*Delaney v. Superior Court, supra,* 50 Cal.3d at p. 798, fn. 8.)

We therefore cannot agree with the Eagle that *every* newspaper advertisement automatically falls within the purview of the media shield law. Even in an era awash with hype and overcommercialization, there remains a fundamental distinction between the reporting and editorial functions of a newspaper and the buying, selling and placing of commercial advertisements. Surely Peter Zenger, A.J. Liebling and Rebecca West occupy more hallowed niches in American history than Joe Camel, Tony the Tiger and the Budweiser talking lizards. We know of no Pulitzer prizes for want ads. (See, e.g., *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376, 389 [93 S.Ct. 2553, 2561, 37 L.Ed.2d 669] [affirming antidiscrimination order barring newspaper from having separate help-wanted categories by sex as incidental to a "valid limitation on economic activity"].)[4]

A recent federal decision is instructive. *In re Madden* (3d Cir. 1998) 151 F.3d 125 involved a commentator, Mark Madden, who ran a 900 number hotline on professional wrestling. Madden claimed the protection of a journalist's privilege when called as a nonparty witness in a trade infringement dispute, refusing to divulge information from his confidential sources. The appeals court disagreed, holding he failed to prove his intent to disseminate "information" to the public as part of a reporting process. As the court explained, "this test emphasizes the intent behind the newsgathering process rather than the mode of dissemination . . . . [and] does not grant status to any person with a manuscript, a web page or a film . . . ." (*Id.* at pp. 129-130.) Madden's mere intent to distribute "information" was not perceived as sufficient, given his own admission that he was an entertainer, not a reporter, disseminating what amounted to creative fiction, not news. The court differentiated between "provid[ing] advertisement and entertainment"

---

[4]The hospital persuasively describes the adverse consequences of extending the shield law to all paid advertisements: "[A] company, intending to defraud the public, could place a newspaper advertisement under a fictitious name for the sale of $100 worth of widgets. In response to the advertisements, customers would mail $100 checks to the company but receive only $5 worth of widgets. If the shield law applied to advertisements of this type, no government authority or private person would have any method of compelling the newspaper to reveal the source of the fraudulent advertising, and the crime would go unchecked." We can think of other horribles: Newspapers could refuse to print license plate numbers in used car advertisements or blithely ignore statutory truth-in-advertising laws. We have no doubt the media itself would be up in arms were any other societal institution to erect such an impregnable barrier to consumer rights.

(outside the privilege) and "gather[ing] news or disseminat[ing] information" (within the privilege). (*Id.* at p. 130.)[5]

We do not go as far as the hospital in arguing that the shield law is limited to "news" or "newsgathering." Other courts have extended the shield laws to cover a variety of editorial functions of a newspaper. (See, e.g., *Gastman v. North Jersey Newspapers Co.* (1992) 254 N.J.Super. 140 [603 A.2d 111] [applying New Jersey shield law to unsigned letter to the editor].) And it conceivably may even cover paid advertorials under certain circumstances. (*Pittsburgh Press Co.* v. *Human Rel. Comm'n supra,* 413 U.S. at p. 386 [93 S.Ct. at p. 2559] ["Under some circumstances, at least, a newspaper's editorial judgments in connection with an advertisement take on the character of the advertisement . . . ."].)

Those issues are better left for another day because the Eagle has failed to meet its burden of proof to show the materials as to which it has invoked the shield law qualify as protected information. As *Delaney* points out, "It is hornbook law that a person claiming privilege bears the burden of proving he is entitled to the privilege. . . . Regardless of the label used (privilege or immunity), the shield law's purpose is the same—to protect a newsperson's ability to gather and report the news. *The newsperson seeking immunity must prove all the requirements of the shield law have been met.*" (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 806, fn. 20, italics added.)

The Eagle has fallen short of a prima facie showing that its employees obtained the advertorials for the journalistic purpose of communicating information to the public. To support its motion to quash, the Eagle offered a terse declaration of Barbara Andrews, its secretary. Nothing in her declaration or in any other supporting declaration established the Eagle's intent to publish these advertorials as part of its editorial process or to transmit news or commentary on matters of public interest to the Downey community. Instead, the Andrews declaration only spoke about the confidentiality expectations of its *"advertising customers."* (Italics added.) They, of course, are not protected by the privileges enjoyed by the press.

The Eagle has done nothing to lead us to conclude otherwise. As far as we know, the Eagle was indifferent to the informational content of these advertisements and would have accepted them whether they sold used cars, promoted the painless removal of unwanted hair, or communicated absolutely nothing.

---

[5]We do not know whether Madden will now expand his 900 number hotline to comment on politics. If so, his ability to claim the benefit of the journalist's privilege may be yet another unintended consequence of Governor (and former professional wrestler) Jesse Ventura's body slam on Minnesota state government.

We stress the limited reach of our decision. Given the Eagle's failure to make the necessary threshold showing, we do not resolve the scope of legitimate journalistic activities encompassed by the shield law's phrase "information for communication to the public." On this issue at least, the Eagle has not yet landed.

### III

■ Our analysis of the shield law obviously does not end the matter. Another safety net, the qualified constitutional privilege, protects the speech and privacy rights of individuals who wish to promulgate their information and ideas in a public forum while keeping their identities secret.

On two separate occasions, the United States Supreme Court has struck down as unconstitutional laws requiring disclosure of the sponsors of publicly distributed literature. (*Talley* v. *California* (1960) 362 U.S. 60 [80 S.Ct. 536, 4 L.Ed.2d 559] [municipal ban on anonymous leafleting]; *McIntyre* v. *Ohio Elections Comm'n* (1995) 514 U.S. 334 [115 S.Ct. 1511, 131 L.Ed.2d 426] [state prohibition on anonymous campaign literature].) Compelled source disclosure runs afoul of the First Amendment because some speakers may be chilled into silence without the cover of anonymity. Even the state's interest in informing voters about the source of political speech does not justify wholesale disclosure requirements without regard to whether the anonymous speech contains fraudulent or false statements.

In *McIntyre* an Ohio woman challenged a $100 fine for distributing unsigned flyers against a proposed local school tax. Noting "a respected tradition of anonymity in the advocacy of political causes," the Supreme Court held the woman's choice to remain anonymous was as protected by the First Amendment as any other components of the publication's content that she was free to include or exclude. (514 U.S. at pp. 343, 348 [115 S.Ct. at pp. 1517, 1519-1520].) While anonymity could be used to conceal dirty tricks, ". . . the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry." (*Id.* at p. 342 [115 S.Ct. at p. 1516].) Despite the unpalatable consequences of free speech, ". . . our society accords greater weight to the value of free speech than to the dangers of its misuse." (*Id.* at p. 357 [115 S.Ct. at p. 1524].)

The state cannot subvert indirectly what it cannot prohibit directly. Separate and apart from the shield law, there is a nonstatutory qualified immunity, grounded in the free speech and privacy provisions of the United States and California Constitutions, that limits what courts can compel through

civil discovery. (See *Mitchell* v. *Superior Court, supra,* 37 Cal.3d 268 [applying qualified constitutional immunity rather than shield law to allow newspersons to withhold identity of sources in defamation suit against them].) As one commentator has explained, ". . . the need to protect associational privacy is no less powerful in litigation, controlled by the judicial branch of the government, than it is when the legislative branch seeks to compel disclosures: the dangers of exposure are no less." (Steinman, *Privacy of Association: A Burgeoning Privilege in Civil Discovery* (1982) 17 Harv. C.R.-C.L. L.Rev. 355, 375.)[6]

California most prominently gave recognition to this qualified constitutional privilege in *Britt* v. *Superior Court* (1978) 20 Cal.3d 844 [143 Cal.Rptr. 695, 574 P.2d 766], treating the compelled disclosure as a form of state action subject to constitutional limitations. In connection with an airport noise suit brought by almost 1,000 adjacent residents, the airport aggressively sought to investigate the political activities of various opposition groups, demanding the names of all persons (including nonlitigants) who attended the meetings, what they said, and how much they gave.

The Supreme Court issued a writ because the sweeping scope of the challenged discovery order unconstitutionally infringed on the residents' First Amendment rights and exceeded the airport's legitimate litigation interests. (20 Cal.3d at pp. 852-855.) The court refused to derogate individual's constitutional privacy interests to liberalized civil discovery. Indeed, the threats to liberty "may be more severe in a discovery context, since the party directing the inquiry is a litigation adversary who may well attempt to harass his opponent and gain strategic advantage by probing deeply into areas which an individual may prefer to keep confidential." (*Id.* at p. 857.)

Numerous decisions have followed *Britt*'s lead to apply the qualified constitutional privilege to block civil discovery that impinges upon free speech or privacy concerns of the recipients of discovery demands and innocent third parties as well. (See, e.g., *Hinshaw, Winkler, Draa, Marsh & Still* v. *Superior Court, supra,* 51 Cal.App.4th 233 [party's confidential settlement with nonparty]; *Estate of Gallio* (1995) 33 Cal.App.4th 592, 597

---

[6]See also Note, *The Big Chill: Third-Party Documents and the Reporter's Privilege* (1996) 29 U. Mich. J.L. Reform 613, 626 ("Third-party discovery poses an unmistakable threat to source confidentiality. If a litigant subpoenas the proper documents, it can easily discover the identity of a source.").

More than 40 years ago, another commentator observed that privileges may promote truth seeking by avoiding conflicts of interest that could lead to perjury. (Louisell, *Confidentiality, Conformity and Confusion: Privileges in Federal Court Today* (1956) 31 Tul. L.Rev. 101, 114-15.) One wonders how the course of recent American presidential history would have been altered had these concerns been heeded today.

[39 Cal.Rptr.2d 470] [living person's will]; *Lantz* v. *Superior Court* (1994) 28 Cal.App.4th 1839, 1854 [34 Cal.Rptr.2d 358] [medical records]; *Harding Lawson Associates* v. *Superior Court* (1992) 10 Cal.App.4th 7, 10 [12 Cal.Rptr.2d 538] [third party personnel records]; *Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 528 [174 Cal.Rptr. 160] [faculty tenure appraisals].)

In *Denari* v. *Superior Court* (1989) 215 Cal.App.3d 1488 [264 Cal.Rptr. 261], a woman alleged she was subjected to excessive force while being booked at a county jail. To support her federal civil rights claim, she sought to compel the county to disclose the names and addressees of fellow arrestees who were within eyeshot or earshot. Despite its clear relevancy, the court refused to issue a blanket order infringing upon the privacy rights of the third party arrestees without a more particularized showing justifying the intrusion.

Similarly, in *Binder* v. *Superior Court* (1987) 196 Cal.App.3d 893 [242 Cal.Rptr. 231], the plaintiffs in a wrongful death case against a dermatologist who failed to diagnose a cancerous mole sought to discover photographs of other patients with similar skin conditions that were subsequently diagnosed as melanoma. The court issued a writ to prevent such snooping as violative of the patients' constitutional privacy rights.

And in *Mitchell* v. *Superior Court, supra,* 37 Cal.3d 268, the Supreme Court blocked discovery of a reporter's confidential sources for a newspaper series concerning Synanon, the controversial drug rehabilitation organization; the articles were subsequently used as a source in *another* article in the Reader's Digest which Synanon alleged was defamatory. The court stressed, "The discovery sought by plaintiffs, however, is quite broad, and is not limited to sources whose information relates to the alleged libelous statements. The Reader's Digest article contains many other statements critical of . . . the Synanon operation. Knowledge of the source of such statements, while arguably relevant to the suit, is not sufficiently essential . . . ." (*Id.* at p. 282.)

■ The qualified privilege is decided on a case-by-case basis. Courts carefully balance the "compelling" public need to disclose against the confidentiality interests to withhold, giving great weight to fundamental privacy rights. Mere relevance is not sufficient; indeed, such private information is presumptively protected. The need for discovery is balanced against the magnitude of the privacy invasion, and the party seeking discovery must make a higher showing of relevance and materiality than otherwise would be required for less sensitive material. (*Mitchell* v. *Superior Court,*

*supra,* 37 Cal.3d at pp. 279-284; *Hinshaw, Winkler, Draa, Marsh & Still* v. *Superior Court, supra,* 51 Cal.App.4th at p. 237; *Lantz* v. *Superior Court, supra,* 28 Cal.App.4th at p. 1854.)

We emphasize the particularized nature of this qualified privilege which must be examined and balanced in light of the facts of each case. In a defamation case brought by a public figure against a journalist, for example, discovery of anonymous sources might be allowed where the additional information is necessary to meet the constitutional burden of proof of actual malice. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at pp. 279-280 [" 'Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story.' "]; see also *Star Editorial* v. *U.S. Dist. Ct. for C.D. of Cal.* (9th Cir. 1993) 7 F.3d 856, 861 [qualified privilege does not apply to libel suit by comedian against tabloid; "when a public-figure plaintiff brings a civil libel action against a media defendant . . . the balance weighs in favor of disclosure"].)

But disclosure is " 'by no means . . . automatic in libel cases.' " (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 280.) It depends upon a weighing of a variety of interrelated factors, including the importance of confidentiality, whether journalists are parties, whether plaintiffs have made a prima facie case of falsity, and whether the information sought "goes to the 'heart' of their suit . . . or is only peripheral to that matter." (*Ibid.*)

IV

Applying the balancing test, we hold the hospital has failed to meet its burden to defeat the qualified constitutional privilege by showing a compelling need to disclose the names of the anonymous authors of the Eagle advertorials. The advertorials involved core political speech, e.g., the allocation of public and private resources for health care in a community hospital. They criticized the hospital's misuse of the discovery process for the defamation lawsuits to muzzle dissent. It is ironic that such faultfinding itself engendered more subpoenas—giving rise to a legitimate concern regarding retaliation. Indeed, the hospital tells us that one mission of this discovery is to add "potential new claims against additional defendants," i.e., to punish the anonymous advertisers for taking issue with their improper use of the discovery process.

This is a classic First Amendment example of why the speakers may have chosen anonymity to avoid being swept into litigation purely out of spite for

speaking out on a hotly contested issue. The impact of the proposed discovery upon protected constitutional rights is severe.

Here the hospital has not sued the Eagle for defamation, nor has it made any showing the advertorials themselves were false, or that they fell outside the bounds of constitutionally protected opinion. Indeed, the hospital reassures us that it does not "have any reason to believe such a [defamation] claim would ever be warranted as to the Eagle." At most the hospital offers rank conjecture that the same people who penned the "somewhat more sanitized" advertorials anonymously authored the other assertedly defamatory writings because of thematic and stylistic similarities between the two. That is not enough. The advertorials are not directly relevant to the defamation lawsuit.

This highly attenuated relationship between the advertorials and the defamatory writings does not warrant shutting off political discourse on an important public issue by speakers who are understandably subpoena-shy. That the hospital already has deposed the 11 known members of Save Our Hospital, but still has not discovered who wrote the advertorials, makes it all the more important to respect the anonymity of those unknown persons. We refuse to join the hospital's unfounded surmise that one of these 11 individuals "already identified [actually] placed the advertisements at issue" and that the "only remaining question is which . . . ." That assumes precisely the answer the challenged discovery seeks to procure. In any event, impeaching a witness on a peripheral issue (such as who authored a nondefamatory advertorial) is not a compelling reason to pierce the anonymity of constitutionally protected speech.[7]

The hospital has not offered any other countervailing reasons to warrant this discovery. It cites source disclosure laws for candidate and ballot proposition advertisements. (Gov. Code, §§ 84501, 91000.) Such a compelling state interest to inform the voting public may exist during election campaigns, thereby justifying narrowly tailored regulations for the "larger circumstances" of organized political advertising. (*McIntyre* v. *Ohio Elections Comm'n, supra*, 514 U.S. at p. 358 [115 S.Ct. at p. 1524] (conc. opn. of Ginsburg, J.) ["We do not . . . hold that the State may not in other, larger

---

[7]Presumably the hospital already has inquired into whether Waite, the single named defendant, is a member of Save Our Hospital. It thus has had the benefit of discovery permitted in *Bodenheimer* v. *Superior Court* (1980) 108 Cal.App.3d 885, 889 [167 Cal.Rptr. 26], where the plaintiffs in a defamation lawsuit were allowed to depose a named defendant regarding his associational membership in a political organization which allegedly conspired with him to defame them. But *Bodenheimer* balked at giving the plaintiffs carte blanche to inquire into the organization's "membership lists or protected discussions in meetings." As to such questions, the court noted that a constitutional problem "of impingement on associational privacy may emerge." (*Id.* at pp. 889-890.)

circumstances, require the speaker to disclose its interest by disclosing its identity."].) These legitimate state interests obviously have nothing to do with the scope of civil discovery in this defamation suit.

Let a peremptory writ of mandate issue directing respondent court to vacate its orders denying petitioner's motion to quash the subpoena and holding petitioner in contempt, and to enter a new and different order granting the motion to quash. The alternative writ is discharged upon the return of the remittitur. Costs are awarded to petitioner.

Rylaarsdam, J., and Bedsworth, J., concurred.